## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES SOO BAHK DO** | : | |
| **MOO DUK KWAN FEDERATION, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:12-CV-00669** |
| | : | **(JUDGE MARIANI)** |
| **TANG SOO KARATE** | : | |
| **SCHOOL, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

This action came before the Court as an action for trademark infringement. The

Plaintiff, United States Soo Bahk Do Moo Duk Kwan Federation, Inc., is a not-for-profit New

Jersey corporation which practices, teaches, and promotes a Korean style of martial arts

known as "Moo Duk Kwan." On April 10, 2012 it filed this action against Tang Soo Karate

School, Inc., d/b/a International Tang Soo Do Moo Duk Kwan Association, a karate school

which also practices, teaches, and promotes Moo Duk Kwan, in Dickson City, Pennsylvania.

The Complaint (which was subsequently amended on April 30, 2012) named as additional

Defendants Eric Kovaleski, the current President and owner of Tang Soo Karate School,

and his father, Robert Kovaleski, the founder and former President of the school.

The lawsuit alleges that the Defendants are liable for infringing trademarks in both

Plaintiff's name and logo. As to the name, the Plaintiff alleges that it owns both the term

"United States Tang Soo Do Moo Duk Kwan Federation" and the term "Moo Duk Kwan" standing alone. As to the logo, Plaintiff alleges that it trademarked a symbol for its organization consisting of a fist surrounded by laurel leaves and berries above a scroll of Korean characters. According to the Plaintiff, Defendants used the term "Moo Duk Kwan" as well as a logo confusingly similar to the fist-and-laurel-leaves design as part of their business.

In response, Defendants counterclaimed that Plaintiff's trademarks should be cancelled on several different grounds, all of which are discussed in detail below.

A nonjury trial was held on these issues from February 9 to February 11, 2015. During the course of that trial, the Court heard testimony from the following witnesses:

1. Lawrence Seiberlich, a long-time Moo Duk Kwan practitioner, who was involved in bringing Moo Duk Kwan to the United States and who serves as a member of the Plaintiff Federation's Senior Advisory Committee;

2. H.C. Hwang, a famous Moo Duk Kwan expert; son of the alleged Founder of Moo Duk Kwan, Grandmaster Hwang Kee; and successor to the Hwang Kee as President of the Plaintiff Federation;

3. Dae Kyu Chang, the owner of a California martial arts studio associated with the Plaintiff Federation;

4. Richard Philip Duncan, the executive administrator of the Plaintiff Federation;

5. Defendant Eric Kovaleski;

2

6. Defendant Robert Kovaleski; and

7. Daniel Segarra, the owner of a New York martial arts studio who expressed

lay opinions on the historical origins of the term "Moo Duk Kwan."

The Court allowed the parties additional time to take the trial deposition of John

Fagliarone, a Tang Soo Do practitioner who was unable to participate at the time of the trial.

Once the deposition was completed and a transcript submitted to the Court, the Court heard

closing arguments on April 13, 2015.

Upon review of all testimony and evidence of record in this case, the Court

concludes that the Plaintiff has proven all elements of its trademark infringement claims

against all three Defendants. The Defendants, on the other hand, have not proven any

grounds for cancellation. Accordingly, judgment will be entered in favor of the Plaintiff and

against Defendants Tang Soo Karate School, Inc., Eric Kovaleski, and Robert Kovaleski.

## II.   Findings of Fact

### a.  Background

1. "Plaintiff United States Soo Bahk Do Moo Duk Kwan Federation is a not-for-

profit corporation of the State of New Jersey which has member organizations throughout

the United States." (Stipulated Facts for Trial, Doc. 120, at ¶ 3.)

2. Defendant Tang Soo Karate School, Inc. ("TSKSI"), d/b/a International Tang

Soo Do Moo Duk Kwan Association, "is an organization for the practice, teaching and

3

regulation of martial arts." (*See id.* at ¶ 4.) Its principal place of business is in Dickson City, Pennsylvania. (Am. Compl., Doc. 27, at ¶ 4.)[1]

3. "Defendant Robert Kovaleski is the past President of Defendant TSKSI and has been directly involved in and has directed such association in adopting and using the marks INTERNATIONAL TANG SOO DO MOO DUK KWAN ASSOCIATION and a fist and laurel leaves Design which are accused of infringement in this case." (Stipulated Facts, ¶ 5.)

4. "Defendant Eric Kovaleski is the current President of Defendant TSKSI and has been a moving force and directly involved in the use of the marks International Tang Soo Do Moo Duk Kwan Association and the fist and laurel leaves Design by such organization." (*Id.* at ¶ 6.)

5. Eric Kovaleski is the son of Robert Kovaleski and took over the business from his father in approximately 1999. (*See* Eric Kovaleski Trial Test., Feb. 10, 2015, at 192:19-193:2.)

6. The Plaintiff filed this action for trademark infringement and unfair competition against the Defendants in 2012. (*See* Stipulated Facts, ¶ 1; Am. Compl. at ¶¶ 24 -42.)

7. Plaintiff owns the following registered trademarks, which it claims the Defendants infringed:

---

[1] All references to the Complaint are to portions admitted, unless otherwise specified.

| Registration No. | Mark | Date of Registration |
|---|---|---|
| 1,443,675 | UNITED STATES TANG SOO DO MOO DUK KWAN FEDERATION | June 16, 1987 |
| 1,446,944 |  | July 7, 1987 |
| 3,023,145 | MOO DUK KWAN | December 6, 2005 |
| 3,119,287 |  | July 25, 2006 |

(Stipulated Facts, ¶ 7.)

8. Defendants then asserted four counterclaims, namely, that Plaintiff's trademarks should be cancelled for (1) genericness; (2) descriptiveness; (3) abandonment; and (4) having been obtained through fraud in the trademark application. (Answ. to Am. Compl. at ¶¶ 68-88.)

### b. History of the Plaintiff Organization

#### i. *The Founding of Moo Duk Kwan and Its Meaning in Korea*

9. In November 1945, Hwang Kee, a Korean national, founded a martial arts studio in Seoul, Korea, which he named "Moo Duk Kwan." (*See* H.C. Hwang Trial Test., Feb. 9, 2015, Doc. 132, at 126:15-127:5, 179:9-11; *see also* Hwang Kee, *The History of Moo Duk Kwan*, Pl.'s Ex. 6, at 7, 21.)

10. According to Hwang Kee, the term "Moo" means "martial, military, prevent inner/outer conflict;" the term "Duk" means "virtue, ethics, discipline;" and the term "Kwan" means "style, school, institute." (Pl.'s Ex. 6 at 19.)

11. Putting these terms together, "Moo Duk Kwan can be translated as follows: 'Style to teach Moo and Duk through training in the martial arts.'" (*Id.*)

12. Hwang Kee has defined "Moo Duk Kwan" elsewhere as "Name of Tang Soo Do School." (Hwang Kee, *Tang Soo Do*, Pl.'s Ex. 35, at 4.)

13. "Tang Soo Do" means "Korean Karate," (*id.*), and "is a generic term for the martial art taught by schools in Plaintiff's organization and by other martial arts schools," (Stipulated Facts, ¶ 8).

14. When Hwang Kee defined "Moo Duk Kwan" as "Name of Tang Soo Do School," in his book *Tang Soo Do*, he meant "name of *our* school to teach[] Tang Soo Do." (Hwang Trial Test., Feb. 9, 2015, at 176:14-16 (emphasis added).) He did not mean "the name of *any* school that might teach Tang Soo Do." (*Id.* at 176:17-19 (emphasis added).)

15. This has been established by the testimony of H.C. Hwang, who is the son of now-deceased Hwang Kee and successor to Hwang Kee as President of the Plaintiff Federation. H.C. Hwang was involved in translating the book *Tang Soo Do*—where the relevant definition is found—from Korean to English. (*See id.* at 174:22-181:5.)

16. Moreover, in an instructional guide written in 1993 by both Hwang Kee and H.C. Hwang, the authors define "Moo Duk Kwan" as "Name of *the* Organization or style." (*Id.* at 180:7-181:5.; Hwang Kee & H.C. Hwang, *Red Belt Instructional Guide*, Pl.'s Ex. 38, at 154 (emphasis added).)

17. The facts that H.C. Hwang was Hwang Kee's son and handpicked successor, (*see* Hwang Trial Test., Feb. 9, 2015, at 175:2-6), and that he worked closely with his father as co-author and translator makes H.C. Hwang's testimony as to Hwang Kee's authorial intent on this point highly credible.

18. H.C. Hwang's testimony as to the definition of "Moo Duk Kwan" is further buttressed by the fact that around the time that Hwang Kee founded the first Moo Duk Kwan studio, other Tang Soo Do studios in Korea used different names to identify their unique schools, such as Yeon Moo Kwan and Chung Do Kwan. (*See* Pl.'s Ex. 6 at 21-22.) These

schools have different English meanings than does the term Moo Duk Kwan. (Hwang Trial Test., Feb. 9, 2015, at 128:14-129:6.)

19. Thus, "Moo Duk Kwan has always been known as a name for a particular school found [sic] by the Founder Hwang Kee in 1945." (Id. at 164:7-8.)

20. Hwang Kee adopted the fist-and-laurel-leaves design, pictured above, as "the official emblem of Grand Master Hwang Kee's Moo Duk Kwan." (Id. at 131:16-132:23.)

21. H.C. Hwang has never seen "the fist and laurel leaves [design] associated with any schools, other than the Moo Duk Kwan schools over in Korea." (Id. at 131:12-15.)

22. H.C. Hwang never had "any doubt that [the design] was created by the Founder," Hwang Kee. (Id. at 131:16-19.)

23. Lawrence Seiberlich is a Moo Duk Kwan practitioner who currently serves as a member of the Plaintiff Federation's Senior Advisory Committee. (Lawrence Seiberlich Trial Test., Feb. 9, 2015, Doc. 132, at 34:16-20.)

24. He is a former U.S. Army serviceman who first began training in Tang Soo Do Moo Duk Kwan while stationed in Korea in 1959. (Id. at 35:9-36:9.)

25. When he was in Korea, he used the term "Moo Duk Kwan" to refer to "the organization that was founded by Hwang Kee, which taught Tang Soo Do." (Id. at 36:23-37:1.)

26. He never saw any martial arts studio in Korea that was called "Moo Duk Kwan" and was not associated with Hwang Kee. (Id. at 37:2-5.)

8

27. He is familiar with the fist-and-laurel-leaves design, which he owns and wears as a pin. (*Id.* at 37:10-38:12.)

28. He knows of no other martial arts school not associated with Hwang Kee in Korea that might be associated with the fist-and-laurel-leaves design. (*Id.* at 38:13-16.)

29. Dae Kyu Chang is a member of the Plaintiff Federation who lived the first nineteen years of his life in Korea, is fluent in Korean, and first trained in Moo Duk Kwan while living in Korea. (Dae Kyu Chang Trial Test., Feb. 10, 2015, Doc. 130, at 96:8-22.)

30. He is now 58 years old and operates a Moo Duk Kwan studio affiliated with the Plaintiff Federation in Santa Barbara, California. (*Id.* at 95:17-96:4.)

31. Mr. Chang developed the following understanding of Moo Duk Kwan while he lived in Korea: "Moo Duk Kwan was [a] prestigious organization then. So if Moo Duk Kwan name is mentioned, Hwang Kee name was followed. If Hwang Kee name was mentioned, Moo Duk Kwan was mentioned." (*Id.* at 97:13-19.)

32. He understands "Moo Duk Kwan" to mean "the name of the organization founded by Hwang Kee." (*Id.* at 97:20-22.)

33. He considers "Moo Duk Kwan" to be a brand name and testified that a person in Korea would not "use the term Moo Duk Kwan to describe a general martial arts school." (*Id.* at 100:9-12, 101:2-4.)

34. He has never heard the name Moo Duk Kwan used to describe an organization in Korea that was not affiliated with Hwang Kee's organization and has never

9

seen the fist-and-laurel-leaves design used in Korea by any organization that was not Hwang Kee's organization. (*Id.* at 101:10-16.)

35. John Fagliarone is a Tang Soo Do practitioner who began his training in 1985 under Master Thomas Richards of the World Tang Soo Do Association. (John Fagliarone Trial Dep., Feb. 13, 2015, Doc. 140, at 5:14-6:4.)

36. The World Tang Soo Do Association includes former members of the Plaintiff Federation and former students of Hwang Kee. (*Id.* at 7:5-8:18.)

37. Accordingly, Mr. Fagliarone is familiar with the name "Moo Duk Kwan," even though he is not affiliated with the Plaintiff. (*Id.* at 7:1-5.)

38. When he "hear[s] Moo Duk Kwan," he "think[s] of Hwang Kee's organization." (*Id.* at 13:23-24.)

39. When he sees the design of a fist and laurel leaves, he "think[s] of their organization also." (*Id.* at 14:1-3.)

> ii. *Creation of the Plaintiff Moo Duk Kwan Federation in the United States*

40. In the early 1960s, Hwang Kee sent one Sang Kyu Shim to the United States "to build the U.S. chapter of the Moo Duk Kwan" in a first attempt to establish a Moo Duk Kwan presence in the United States. (Hwang Trial Test., Feb. 9, 2015, at 140:21-141:4.)

41. H.C. Hwang was present at a meeting when his father discussed the plan with Mr. Shim. He was therefore well aware of the plan. (*Id.* at 141:7-10.)

42. Mr. Shim then went to the United States representing the Korean Moo Duk Kwan Association. While in the United States, he taught and evaluated American students before those students would be sent to Korea for Moo Duk Kwan certification. (*Id.* at 141:11-142:12.)

43. Among others, he trained Lawrence Seiberlich and guided Mr. Seiberlich in promoting and running a Moo Duk Kwan school in Minnesota. (Seiberlich Trial Test. at 44:23-45:8.) Mr. Seiberlich understood that Mr. Shim was sent by Hwang Kee for these purposes. (*Id.* at 45:25-46:4.)

44. In 1968, Hwang Kee appointed another representative to come to the United States, Jae Joon Kim, who continued doing the same work as Mr. Shim until 1973. (Hwang Trial Test., Feb. 9, 2015, at 142:13-143:6.)

45. In the mid-1960s until 1970, Moo Duk Kwan regional branches had been established in New York, Michigan, California, Washington, Texas, Florida, and New Jersey, as well as Maryland and/or Washington, DC.[2] (*See id.* at 143:15-145:6.)

46. These branches were all operated by individuals authorized as representatives of the Korean Moo Duk Kwan. (*Id.* at 145:7-11.)

47. Hwang Kee had procedures in place to monitor these representatives, such as having them send films of their martial-arts performance to Korea for the Moo Duk Kwan

---

[2] It is unclear from the testimony and the document it references (Pl.'s Ex. 6 at 71) whether the Washington, DC regional branch stated in the document is the same as the Silver Springs, Maryland branch that Mr. Hwang mentions.

to evaluate and issue corresponding certificates. (*Id.* at 146:1-18.) The regional representatives would also send reports to Hwang Kee. (*Id.* at 146:19-21.)

48. H.C. Hwang had personal contact with many of the regional representatives. (*Id.* at 147:9-22.)

49. In 1974, Hwang Kee and H.C. Hwang traveled to many cities and states across the United States to learn about some of their instructors' concerns and to make findings about what should be done to create a national, American organization. (*Id.* at 147:24-148:19.)

50. The Hwangs found that instructors in the United States had concerns in two primary areas: first, that they wanted to have one national organization centered around the Korean Moo Duk Kwan organization under Hwang Kee, and, second, that they were concerned that many instructors were not registered in Korea. (*Id.* at 149:8-13.)

51. To address these problems, Hwang Kee organized a meeting of all the Dan-level[3] Moo Duk Kwan members and instructors, to be held in Burlington, New Jersey in November 1974, for the purposes of developing "standardized teaching methodology, standardized techniques, standardized uniform, schools etc." and forming a U.S. organization "as the sole representative of [Hwang Kee's] Korean organization." (*See id.* at 149:14-150:2; Seiberlich Trial Test. at 47:3-13.)

---

[3] A "Dan" is a Moo Duk Kwan member who holds a Black Belt degree. (Seiberlich Trial Test. at 48:9-12.) Beginner and colored-belt participants are called "Gups." (*Id.* at 48:12-13.)

52. Approximately seventy to ninety Dans met in Burlington, New Jersey, all of whom were associated with Hwang Kee's Moo Duk Kwan organization. (Seiberlich Trial Test. at 48:8-17.)

53. Most of the Dans wore the fist-and-laurel-leaves emblem at the Burlington meeting. (*Id.* at 48:18-25.)

54. Hwang Kee spoke at the meeting and "reaffirmed" that the purpose of the meeting "was to standardize technique, teaching, and the schools, and to be the single representative of his organization in Korea and to control its intellectual property in the United States." (*Id.* at 49:1-7.) H.C. Hwang also recalled at trial that these were the primary purposes of the incipient American organization. (Hwang Test., Feb. 9, 2015, at 158:2-19.)

55. The Dans then voted to start the envisioned organization and to set up a task force to create a charter, bylaws, and other necessary organizational documents. (Seiberlich Test. at 49:10-19.)

56. A charter convention was held in June 1975 at the Kennedy Hilton at JFK International Airport. (*Id.* at 50:3-7.)

57. The convention adopted the proposed charter and bylaws for the new U.S. Federation. (*See U.S. Tang Soo Do Moo Duk Kwan Federation, Inc. News*, Vol. 1, No. 1, May 1976, Pl.'s Ex. 23, at T-126.) The Plaintiff's original charter is included as Plaintiff's Exhibit 22.

13

58. The Plaintiff—which was at the time called "United States Tang Soo Do Moo Duk Kwan Federation"—was incorporated in June 1976 in the United States. (Stipulated Facts, ¶ 9.)

59. "By its charter and incorporation, Plaintiff was founded to be an organization for the practice, teaching and regulation of martial arts. It included many practitioners in the United States who had been taught and certified by Hwang Kee and his organization in Korea." (*Id.* at ¶ 10.)

### iii. Trademark Registration and Use in Commerce

60. Plaintiff did not immediately register its trademarks following incorporation. (See dates listed in Stipulated Facts, ¶ 7.)

61. Rather, it registered its first trademark, "UNITED STATES TANG SOO DO MOO DUK KWAN FEDERATION," on June 16, 1987. It registered the trademark "MOO DUK KWAN" on December 6, 2005, and registered two variations of the fist-and-laurel-leaves design on July 7, 1987 and July 25, 2006, respectively. (*Id.*)

62. Federation President Phillip Duncan testified that the reason for the wait was Plaintiff's belief that "[t]rademark use accrues, and we accrued use in that mark to the point we felt it was prudent for us to improve awareness of our ownership of that mark [i.e., by registering it]. We decided to distinguish it." (Phillip Duncan Trial Test., Feb. 10, 2015, Doc. 130, at 162:11-17.)

63. Regardless of the reason for the delay, in the time between incorporation and the first trademark registration, Plaintiff's organizational publications referred to the fist-and-laurel leaves as the "official symbol" of the U.S. Tang Soo Do Moo Duk Kwan Federation. (See, e.g., Pl.'s Ex. 23 at T-131.)

64. The Plaintiff Federation and its member schools have made and continue to make significant use of its trademarks in commerce. During trial, Phillip Duncan identified various documents and web pages dating back to at least 1990 which show continuous use of the marks. (See Duncan Trial Test. at 120:10-135:17 (discussing Pl.'s Exs. 25, 27-28, 33, 42-43, 45-47, 49-50, 59, 62-63); see also Pl.'s Ex. 29, 31, 65 (examples of additional uses).)[4]

65. Several of these exhibits contain documents stating "There Is Only One Moo Duk Kwan." (See Pl.'s Exs. 25 at T-451; 33 at T-608; 63 at 1-2.)

66. The Plaintiff Federation contains "between 4 and 5 thousand individual members[,] about 160 individual studios and about 300 certified instructors throughout the United States." (Duncan Trial Test. at 114:17-20.)

67. It operates through "certified studios," which are authorized to use the Federation's trademarks. (Id. at 114:20-115:2.)

68. Instructors who wish to open certified studios must hold at least "a second degree black belt or second Dan" and must pass through a detailed application process,

---

[4] Not all of the marks were registered at the time of their use in these exhibits. Nonetheless, the exhibits show their use in commerce over a significant period of time.

which includes inspection of the proposed studio facility by a regional examiner, an apprenticeship period of teaching and training, and various examinations, one of which—for master-level instructor—takes eight days. (*Id.* at 115:8-116:12.)

69. The Federation also maintains a formal application process for Dan certification, whereby applicants are tested and evaluated in front of a regional examining board, which then sends a recommendation to national headquarters for review as to whether Dan status should be granted to the applicant. (*Id.* at 116:13-117:2.)

70. The Federation also provides a "Gup and Dan Manual" to all new members of the organization, published in 2009, which lists the "[f]ederally protected Trademarks and Service marks" mentioned above, with the trademark registration (®) symbol. (*Id.* at 118:24-119:3; *Gup & Dan Manual*, Pl.'s Ex. 86, at iv.)

### c. History of the Defendant Organization

#### i. General History

71. "Defendant Tang Soo Karate School, Inc. . . . is an organization for the practice, teaching and regulation of a martial art founded in 1994." (Stipulated Facts, ¶ 11.)

72. The phrase "Tang Soo Karate" in Defendant's name was meant to identify the type of martial art it teaches. (Erick Kovaleski Trial Test., Feb. 10, 2015, Doc. 130, at 193:6-8.)

73. Since 1999, the Defendant karate school has been one-hundred percent owned by Defendant Eric Kovaleski. (*Id.* at 192:24-193:2.) All of the revenues and profits from the business go to him. (*Id.* at 193:12-14.)

74. Eric's father, Robert Kovaleski, founded Defendant TSKSI in 1994 "under [the] consent" of his former teacher, Master Frank Trojanowicz. (Robert Kovaleski Trial Test., Feb. 11, 2015, Doc. 133, at 48:25-49:5.)

75. Robert Kovaleski first started studying martial arts in 1966 and began learning Tang Soo Do Moo Duk Kwan under Master Trojanowicz from 1969 to 1975. (*Id.* at 42:23-43:6, 197:4-7.)

76. Frank Trojanowicz was a founding member and a board member of the Plaintiff organization. (*See* Seiberlich Trial Test. at 51:4-15; Hwang Trial Test., Feb. 9, 2015, at 111:8-13; Eric Kovaleski Trial Test., Feb. 10, 2015, at 189:23-190:13.) When he trained Robert Kovaleski, he was a member of the Plaintiff organization. (*See* Robert Kovaleski Trial Test. at 43:7-46:7.)

77. Mr. Trojanowicz later formed his own Tang Soo Do organization. The organization originally used the marks "Moo Duk Kwan" and the fist-and-laurel-leaves design, but, following litigation initiated by the Plaintiff, agreed to stop using them. (Seiberlich Trial Test. at 64:6-69:6.)

17

78. Master Trojanowicz's past and present affiliations are to entities separate and distinct from Defendant TSKSI, founded by Robert Kovaleski in 1994. (*See, e.g.*, Eric Kovaleski Trial Test., Feb. 10, 2015, at 189:5-22.)

### ii. Attempts to Procure Trademarks

79. "On October 4, 2001, Eric Kovaleski filed an application with the United States Patent and Trademark Office ('USPTO') to register the mark INTERNATIONAL TANG SOO DO MOO DUK KWAN ASSOCIATION and Plaintiff's fist and laurel branches design as his own trademark." (Stipulated Facts, ¶ 12; *see also* USPTO Trademark Application, Sept. 23, 2001, Pl.'s Ex. 109.)

80. The fist and laurel leaves design that Mr. Kovaleski attempted to trademark appears as follows:



(Pl.'s Ex. 109 at 5-6; *cf. also* Stipulated Facts, ¶ 14; Defendant's Patch Exemplar, Pl.'s Ex. 118.)

81. Mr. Kovaleski's trademark application included a sworn statement that "Eric P. Kovaleski declares: that he is the owner of the mark sought to be registered . . .; that to

the best of his knowledge and belief no other person, firm, corporation or association has

the right to use said mark in commerce, either in identical form or in such near resemblance

thereto as to be likely, when applied to the goods and/or services of such other person, to

cause confusion, or cause mistake, or to deceive . . . ." (Pl.'s Ex. 109 at 2.)

82. The USPTO nonetheless rejected his trademark application, stating: "The

examining attorney refuses registration . . . because the applicant's mark, when used on or

in connection with the identified services so resembles the marks [previously registered by

Plaintiff] as to be likely to cause confusion, or to cause mistake, or to deceive." (USPTO

Decision, Jan. 4, 2002, Pl.'s Ex. 110, at 1.)

83. The notice of rejection stated that Mr. Kovaleski had six months in which to

respond or his application would be abandoned. (*Id.*)

84. Mr. Kovaleski never submitted a response to the USPTO and accordingly

abandoned his application. (*See* Stipulated Facts, ¶ 13.)

85. At trial, Eric Kovaleski testified that he believed the examiner rejected his

application because "I couldn't trademark our name around a generic logo." (Eric Kovaleski

Trial Test., Feb. 10, 2015, at 197:3-7.) He then apparently changed his answer and testified

that the only problem with his trademark application was that he needed to submit a new

drawing that conformed to the requirements listed on page 2 of the rejection notice. (*Id.* at

197:8-16.)

86. However, the rejection notice is written in clear and precise language that states that the primary reason for rejection is a likelihood of confusion with Plaintiff's preexisting trademarks. (See Finding of Fact, supra, ¶ 82.) Mr. Kovaleski's contrary interpretations are not reasonably supported by the text of the notice and are therefore accorded no weight.

87. On September 1, 2014, while this litigation was ongoing, Eric Kovaleski filed another trademark application for the mark "TANG SOO DO MOO DUK KWAN ENCYCLOPEDIA" which was identified as "[a] series of educational and instructional books and written articles in the field of the [sic] history, philosophy and martial arts; Encyclopedias in the field of history, philosophy and martial arts." (USPTO Trademark Application, Sept. 1, 2014, Pl.'s Ex. 135, at 1-2; see also Eric Kovaleski Trial Test., Feb. 11, 2015, at 29:9-20.)

88. This application included a declaration containing substantially the same information as that discussed in Mr. Kovaleski's first trademark application at Finding of Fact ¶ 81, supra: to wit, that Mr. Kovaleski was the owner of the mark sought to be registered and that "no other person has the right to use the mark in commerce." (Pl.'s Ex. 135 at 5.)

89. The USPTO rejected this second application on the same grounds, i.e.: "Registration of the applied-for mark is refused because of a likelihood of confusion with the marks [held by Plaintiff]." (USPTO Decision, Dec. 21, 2014, Pl.'s Ex. 136, at 2.)

90. Defendants had six months to respond to this decision. (Id. at 1.) The six-month time period, however, had not expired by the time of trial.

### iii.  Use of the Relevant Marks in Commerce

91. Notwithstanding the USPTO's decision, the Defendants continued and even increased their use of the "International Tang Soo Do Moo Duk Kwan" mark after receiving the rejection notice. (Eric Kovaleski Trial Test., Feb. 10, 2015, at 199:11-16.)

92. In November 2011, Defendants placed "a big sign" on the front of their building, which uses the same fist-and-laurel-leaves design that was the subject of Defendant's failed trademark application. (*Id.* at 199:24-200:13, 205:25-206:4.) They also use similar signs on other parts of the building. (*See id.* at 200:14-19; *see also* Pl.'s Ex. 102 at 1-5 (collection of photographs of Defendants' storefront).)

93. Defendants use certificates using the same design and the phrase "International Tang Soo Do Moo Duk Kwan Association." (Eric Kovaleski Trial Test., Feb. 10, 2015, at 200:20-201:2; Pl.'s Ex. 102 at 6-7; Black Belt Certificate, Pl.'s Ex. 120; Sa Bom and Kyo Sa Certificates, Pl.'s Ex. 121.)

94. Defendants embroider the same design on the backs of their black belt uniforms, which they sell for $135. (Eric Kovaleski Trial Test., Feb. 10, 2015, at 202:4-203:17.)

95. Four or five years ago (i.e., before this litigation commenced but after the first trademark application was rejected), Defendants sold t-shirts with the same design. (*Id.* at 204:2-16.)

21

96. The Defendant Kovaleskis are also profiled on third-party website *Tang Soo Do World*, which contains pictures of them wearing uniforms with the same emblem and standing in front of a large picture of the emblem. (*Id.* at 204:24-205:2, 205:13-14; *Tang Soo Do World*, Pl.'s Ex. 105, at 1-2.) However, it is unclear how *Tang Soo Do World* got these pictures. (*See* Eric Kovaleski Trial Test., Feb. 10, 2015, at 205:3-7.) Eric Kovaleski testified that a student may have sent them to the website, apparently without his express permission. (*Id.* at 205:6-12.)

97. In or around late 2011, Defendants superimposed a large version of the same emblem on their studio floor. (*Id.* at 205:21-206:12.)

98. In 2012, Eric Kovaleski sent out advertisements for a "Mega Martial Arts Weekend" using the name "International Tang Soo Do Moo Duk Kwan Association™" and Defendant's fist-and-laurel leaves emblem. (*See* Stipulated Facts, ¶ 16; P.J. Steyer Letter, Feb. 17, 2012, Pl.'s Ex. 104, at 2-6; Phillip Duncan Trial Test. at 158:18-159:23.)

99. Eric Kovaleski "continue[s] to use [the fist-and-laurel leaf emblem] for [his] day-to-day business." (Eric Kovaleski Trial Test., Feb. 11, 2015, at 7:13-15.)

100. Indeed, Mr. Kovaleski created a flier for the "USA National Karate Championships" to be held from June 27 to June 29, 2014 that uses the same emblem. (Pl.'s Ex. 134 at 1.)

22

### d. Trademark Infringement

101. Plaintiffs own the registered trademarks in question. (*See* Stipulated Facts, ¶ 7.)

102. Defendants' name "International Tang Soo Do Moo Duk Kwan Association" is very similar to Plaintiff's registered mark United States Tang Soo Do Moo Duk Kwan Federation and uses fully Plaintiff's registered mark MOO DUK KWAN.

103. Defendants' emblem is also extremely similar to Plaintiff's registered marks in its fist-and-laurel-leaves design. (*Cf.* Findings of Fact, *supra*, ¶¶ 7, 80.)

104. The emblems that both parties use in their daily business are also very similar:

Plaintiff's Emblem         Defendants' Emblem

(*Id.* at ¶ 14.)

105. An objective comparison of the marks registered and owned by the Plaintiff with those used by the Defendants leads the Court to conclude that many or most

consumers of the martial arts services provided by the two organizations are very likely to be confused by the similarity of their names and emblems.

106. Plaintiffs and Defendants offer the same or substantially similar services. The Plaintiff Federation was founded in part to "undertake any and all legal activities which will directly or indirectly further and encourage the study, the practice, and the growth of public recognition of the Korean martial art known as Tang Soo Do." (Charter of U.S. Tang Soo Do Moo Duk Kwan Federation, Pl.'s Ex. 22, at § 2(A).) Likewise, "Defendant Tang Soo Karate School, Inc. . . . is an organization for the practice, teaching and regulation of martial arts." (Stipulated Facts, ¶ 4.)

107. "The services of plaintiff and defendants are advertised and promoted through the same trade channels. Both are membership organizations. Both have Internet cites [*sic*] promoting their services in a similar fashion. Both have exhibitions for member organizations. Both provide services to their members for their instruction and their conduct of their services." (*Id.* at ¶ 17.)

108. Both organizations provide Gup, Dan, and instructor memberships. (*See, e.g.,* Eric Kovaleski Dep., Jan. 18, 2013, Pl.'s Ex. 156, at 46:12-48:14; Seiberlich Trial Test. at 58:16-23.)

109. Both organizations provide certificates to members, using remarkably similar designs. (*See, e.g.,* Pl.'s 42-43, 45, 47 (Plaintiff's certificates); 121-22 (Defendants' certificates and applications for membership).)

24

110. Both organizations hold martial arts tournaments. (*See, e.g.*, Pl.'s Exs. 28, 104.)

111. At the most basic level, both organizations hold themselves out as teaching and practicing the arts of Tang Soo Do and Moo Duk Kwan.[5]

### e. Counterclaims

112. Ordinarily, the above facts might be sufficient to create the factual groundwork for a successful claim of trademark infringement. However, Defendants assert several significant counterclaims that require additional findings of fact.

#### i. Genericness and Descriptiveness

113. Defendants' first counterclaim asserts that Plaintiff's trademarks should be cancelled on grounds of genericness; that is, that "Plaintiff's Registrations are comprised of terms that are generic for the services for which they are registered." (Answ. to Am. Compl., Doc. 28, at ¶ 69.)

114. Defendants' second counterclaim asserts that Plaintiff's trademarks should be cancelled on grounds of mere descriptiveness; that is, that "[P]laintiff's Registrations are primarily descriptive of [P]laintiff's services for which they are registered." (*Id.* at ¶ 75.)[6]

115. Though these claims are legally distinct, they both depend for their resolution on the meaning of the same terms and symbols.

---

[5] This is true regardless of whether one defines "Moo Duk Kwan" as an art, style, school, philosophy, or anything else. For present purposes, the operative fact is that, however the parties believe Moo Duk Kwan should be precisely defined, both organizations purport to practice it.

[6] The descriptiveness claim was the focus of very little argument attention at trial or in the post-trial submissions. But it has never been withdrawn and appears to remain at issue.

25

116. It is undisputed that the Korean phrase "Tang Soo Do" is the generic name for the martial art taught by both Plaintiff and Defendants. (Stipulated Facts, ¶ 19.)

117. It is further undisputed that the Korean word "do jang" is the generic name for a martial arts school or institute. (Id.)

118. Moreover, as discussed above, the preponderance of the evidence indicates that the term "Moo Duk Kwan" refers to the Tang Soo Do school first founded by Hwang Kee in 1945 and carried on by the Plaintiff U.S. Federation. (Findings of Fact, supra, ¶¶ 12-39.)

119. The evidence that purports to show otherwise is unconvincing, for the following reasons.

120. First, Defendants provided the testimony of Daniel Segarra, a Tang Soo Do Moo Duk Kwan practitioner who was actively involved in the Plaintiff organization for nearly twenty years. (See Daniel Segarra Trial Test., Feb. 11, 2015, Doc. 133, at 69:23-72:4.)

121. Mr. Segarra did a great deal of volunteer work with the Plaintiff organization, including providing drawings, diagrams, and translations for certain of Hwang Kee's books; hosting and maintaining the Plaintiff's website; serving on the Plaintiff's Board of Directors; producing video instructional guides; and designing logos (albeit not the fist-and-laurel-leaves emblem itself). (Id. at 72:8-78:9.) During this time, he considered H.C. Hwang "like a father figure." (Id. at 75:8-9.)

122. Mr. Segarra understands "Moo Duk Kwan" to mean "School of Martial Virtue." (*Id.* at 78:17-24.)

123. When he was involved with the Plaintiff organization, he believed that the term "Moo Duk Kwan" referred to the Plaintiff organization only. (*Id.* at 78:25-79:4.)

124. However, certain independent research caused him to change his mind and believe that "Moo Duk Kwan" is a generic term that had been used long before Hwang Kee founded his organization. (*See id.* at 79:5-21.)

125. Specifically, around 1995 or 1996, Mr. Segarra came upon an article by one Fred Scott. The article "stated that the term, Moo Duk Kwan, was generic and originally founded in Japan in 794, by the Emperor of Japan." (*Id.* at 79:22-80:14.)

126. The basis for Scott's conclusion was that an institute in Japan, founded in 794 A.D. went by the Japanese name "Butokuden," which, like Moo Duk Kwan, translates to English as "martial virtue school." (*Id.* at 99:8-18.)

127. The last character of both terms is "ken" in Japanese and "kwan" in Korean. They both can be interpreted synonymously in English, insofar as "ken" means "mansion, hall, headquarters, building, etc." and "kwan" means "school or academy." (*Id.* at 99:18-22.)

128. Mr. Segarra brought the Scott article to H.C. Hwang's attention, because it contradicted what he had learned from Hwang Kee about the history of their organization and the meaning of its name. (*Id.* at 80:12-21.)

27

129. H.C. Hwang was unconcerned by the information contained in the Scott article, and purportedly told Segarra, "What's the difference, if there was a Moo Duk Kwan in Japan, if there's a Moo Duk Kwan in Korea, they're two different areas." (Id. 81:24-82:10.)

130. Aside from the information contained in the Scott article, Segarra also "came across a study done on the martial arts during the Japanese occupation" of Korea, which study was commissioned by the "Seoul History Museum or Folk Museum." This study pointed to several schools specifically called Moo Duk Kwan that used the same characters as the Plaintiff organization, from 1923 to 1942. (Id. at 111:16-112:1.)

131. The Defendants provided no evidence to show any kind of causal link between the use of the Japanese term "Butokuden" during the early medieval period and the use of the Korean term "Moo Duk Kwan" over a millennium later. The only evidence before the Court is that the Japanese term "Butokuden," which purports to have the same English translation as "Moo Duk Kwan," was used in Japan in 794 A.D. It has not been shown that it was ever used afterwards or that, if it was, this had any effect on the use of Moo Duk in Korea and the United States.

132. Moreover, the only evidence supporting the conclusion that "Moo Duk Kwan" was used in Korea between 1923 and 1942 comes from Daniel Segarra's book The Secrets of the Warrior-Scholar: The Untold History of Tang Soo Do, V. 1.3. This book was not admitted into evidence. (See id. at 112:25-113:7.) But even if it were, it provides no substantiation for the claim that other schools using the name "Moo Duk Kwan" existed

before Hwang Kee founded his school, with the exception of records from the National Folk

Museum of Korea, which were also not submitted as exhibits. (*See* Daniel Segarra, "From

Hwa Soo Do to Tang Soo Do," *The Secrets of the Warrior-Scholar*.)

133. Next, Defendants provide evidence of the widespread use of the Moo Duk

Kwan name and logo in various published sources going back to the 1960s.

134. These published sources include magazines that contain pictures that show

the logo being used by various practitioners or at certain events, use of the marks in

advertisements for Moo Duk Kwan studios or events, advertisements for Moo Duk Kwan

merchandise, and mentions of "Moo Duk Kwan" in articles or letters to the editors.[7] (*See,*

*e.g.*, Defs.' Ex. 1 at 5,[8] 64-65; Ex. 2 at 42, 64; Ex. 3 at 64-65; Ex. 4 at 5, 12, 64; Ex. 5 at 52,

57, 65; Ex. 7 at 35; Ex. 8 at 52, 64-65; Ex. 9 at 10, 30, 64, 12,[9] 53, 65; Ex. 10 at 64-65; Ex.

11 at 4, 18, 65; Ex. 12 at 7, 32; Ex. 13 at 15, 17, 21, (4); Ex. 14 at 10, 58-59, (5); Ex. 18 at

(2); Ex. 19 at 3; Ex. 20 at 57, 81, (6); Ex. 21 at (2), 14, 80; Ex. 22 at (3); Ex. 23 at (2), 79-80;

Ex. 24 at (2), 51-52, 65; Ex. 25 at (2), 67, 79; Ex. 26 at (2), (3); Ex. 27 at (2); Ex. 28 at (2),

(3), 10, 55, 59; Ex. 30 at (2)-(5), (7), 40, 122; Ex. 31 at (2)-(3), (5)-(6), (9), 80; Ex. 32 at (1),

2, (4), (5)-(8).)

---

[7] Some of the photos reproduced, being from old magazines, are blurry or unclear. The Court nonetheless accepts Eric Kovaleski's testimony that the pictures are what he says they are. (*See generally* Eric Kovaleski Trial Test., Feb. 11, 2015, at 122:14-144:25.)

[8] All page numbers cited are to the page numbers from the original source. When no original page number appears in the original source, the citation is to the page number of the exhibit, in parentheses.

[9] Defendants' Exhibit 9 appears to contain excerpts of two separate magazines. Thus, the pages are listed nonsequentially.

135. However, many of the organizations included in these magazines were either affiliated with the Plaintiff or prosecuted by the Plaintiff for trademark infringement. (*See* Hwang Trial Test., Feb. 9, 2015, at 167:6-172:14; Phillip Duncan Trial Test. at 132:22-133:18, 154:1-24; Segarra Trial Test. at 104:19-105:18.)[10]

136. Nonetheless, others are unaccounted for.

137. Defendants also submitted a collection of Moo Duk Kwan patches, using the fist-and-laurel-leaves design and/or the term "Moo Duk Kwan," which Eric Kovaleski assembled from a Google image search. (*See* Def.'s Ex. 55; Eric Kovaleski Trial Test., Feb. 11, 2015, at 183:5-12.) Mr. Kovaleski testified about the background of patches as to which he has personal knowledge, and stated that none of them are related to the Plaintiff organization. (*See* Eric Kovaleski Trial Test., Feb. 11, 2015, at 159:22-169:10.)

138. Exhibit 55 is not the direct result of Mr. Kovaleski's Google image search. Rather, Mr. Kovaleski ran an independent search, then collected the patches that he considered relevant and placed them in this document. (*Id.* at 162:2-8.)

139. The Court does not know whether the pictures selected for inclusion in Exhibit 55 are representative of the broader results of Mr. Kovaleski's search.

140. Nor is the Court able to determine the status of the emblems as to which Mr. Kovaleski has no personal knowledge.

---

[10] Lists of these studios are compiled in Plaintiff's Exhibits 93 and 158 and Plaintiff's Proposed Findings of Fact ¶¶ 92-94 (Doc. 137). These are demonstrative exhibits created by the Plaintiff for litigation. The Court only accepts the information contained therein as true to the extent it is supported by the trial testimony cited. Those other aspects of Plaintiff's demonstrative exhibits which contain representations that are not supported by trial testimony are not accepted as true.

141. The Court has no way of knowing how many of the organizations included in Exhibit 55 are now defunct, or how many of the emblems shown therein were used only a long time ago. (*Cf. id.* at 187:16-21.)

142. Other patches did not stand alone in original sources, but were only taken from pictures of uniforms. (*Id.* at 183:5-9.) The Court does not know whether the individual practitioners wearing these uniforms were associated with the Plaintiff or, if not, received the patch through authorized channels. In fact, some of the pictures were taken from the uniform of former Plaintiff's member Frank Trojanowicz. (*Id.* at 183:13-19.)

143. Other pictures of patches refer to organizations that do not operate primarily in the United States. (*Id.* at 185:9-189:11.)

144. As additional evidence of the generic use of the Moo Duk Kwan name and logo, Defendants admitted various photos that were given to Eric Kovaleski by Grand Master Frank Trojanowicz. (*See id.* at 170:14-178:24.)

145. However, nearly all of these photographs either depict uses of the marks by either Frank Trojanowicz or Eric or Robert Kovaleski. (*See id.*; Def.'s Ex. 45 (photographs).)

146. The Kovaleskis' prior uses are not probative of genericness, because it is precisely these uses that are at issue in this case.

147. Moreover, as noted above, Frank Trojanowicz was a member of the Plaintiff Federation until the early 1980s. (Seiberlich Trial Test. at 64:6-17.) He then formed his own

31

Tang Soo Do Moo Duk Kwan organization, which the Plaintiff Federation sued for trademark infringement. (*Id.* at 64:18-25.)

148. That lawsuit ended in a Consent Judgment, whereby Mr. Trojanowicz and his co-defendants stipulated that the Federation was the only entity entitled to use the fist-and-laurel leaves emblem and the name "United States Tang Soo Do Moo Duk Kwan Federation." (Stipulation, Pl.'s Ex. 80, at ¶¶ 1-2.)

149. Thus, the photographs of Trojanowicz and his studio were either taken (1) while he was a member of the Plaintiff Federation, in which case his use was presumably authorized by the Plaintiff; (2) after he left the Plaintiff Federation but before the Consent Judgment was entered, in which case his use was subsequently litigated and is now subject to the Consent Judgment; or (3) after the Consent Judgment was entered, in which case he would have been acting in violation of the Judgment. In none of these cases would his use of the emblem or name be probative of genericness.

150. Finally, Robert Kovaleski testified from his personal recollection that when he began studying Moo Duk Kwan, around 1969 into the 1970s, "not only Moo Duk Kwan, but also the fist and laurel . . . were everywhere" across northeastern Pennsylvania. (Robert Kovaleski Trial Test. at 198:16-22.)

151. At tournaments that he attended in the 1970s, he noticed many different types of patches on practitioners' uniforms, including the fist and laurel leaves. (*Id.* at 199:2-

32

22.) He testified that these patches were worn by people unaffiliated with Hwang Kee. (*Id.* at 199:23-200:5.)

152. Eric Kovaleski also recalls seeing uses of the fist-and-laurel-leaves patch and the phrase "Moo Duk Kwan" by practitioners at tournaments who are unaffiliated with the Plaintiff. (Eric Kovaleski Trial Test., Feb. 11, 2015, at 118:15-119:11.)

153. The Kovaleskis provided no evidence to substantiate their assertions that the practitioners they observed were indeed unaffiliated with Hwang Kee, nor did they provide a basis to establish how they could personally know the affiliations of anonymous Moo Duk Kwan practitioners. Finally, they did not provide a basis for the Court to conclude that, even if it could be shown that the practitioners themselves were unaffiliated with Hwang Kee, they did not buy the patches at issue from an authorized dealer of Moo Duk Kwan merchandise or in some other manner that did not violate Plaintiff's trademark rights.

### ii. Abandonment

154. Defendants' third counterclaim asserts that Plaintiff's trademarks should be cancelled on the basis of abandonment; that is, that "[t]hrough plaintiff's course of conduct, including acts of omission as well as commission, the plaintiff's Registrations have lost whatever significance as trademarks they may have had." (Answ. to Am. Compl. at ¶ 79.)

155. Much of the evidence for this claim comes from the karate magazines and Google image searches discussed above.[11]

156. Additionally, Defendants proffered certain magazines and websites that sell Moo Duk Kwan merchandise in order to show that Plaintiff fails to police its own trademark ownership. (*See* Eric Kovaleski Trial Test., Feb. 11, 2015, at 153:16-159:16; *see also* Defs.' Exs. 43-44.)

157. However, the legal status of the marks used in these catalogs is not clear from the face of the documents or from Eric Kovaleski's testimony about them. For instance, it is not clear whether the merchandise that appears in Exhibits 43 and 44 is used with Plaintiff's permission, as would be the case if, among other uses, they are sold by authorized member studios. (*Cf.* Duncan Trial Test. at 148:23-149:12.)

158. Moreover, the Plaintiff notified certain sellers included in Exhibits 43 and 44 that they were infringing on their trademarks (though it does not appear that Plaintiff proceeded further to litigate these matters). (*See id.* at 149:13-150:18.)

159. Phillip Duncan, as president of the Plaintiff Federation, spends a significant amount of time on trademark enforcement activities. He "follow[s] the directives of the board with respect to preserving their compliance with our charter and bylaws to evaluate member

---

[11] Many of the uses contained in these exhibits were made prior to Plaintiff's first registrations in 1987. Of course, for purposes of analyzing abandonment, all that matters are the uses that occurred *after* the trademarks were registered.

reports of someone that appears to be an infringer and help facilitate making a decision about what action needs to be taken." (*Id.* at 135:18-136:2.)

160. He spends approximately twenty to thirty percent of his time engaged in trademark enforcement activities. (*Id.* at 136:3-7.)

161. Expenses for trademark enforcement constitute "about 15 percent or lower" of the Plaintiff's expenditures "in a normal year." (*Id.* at 136:8-13.)

162. These enforcement activities include the aforementioned litigation against Mr. Trojanowicz and his co-defendants and other complaints sent to perceived trademark violators. (Duncan Trial Test. at 136:14-148:15.)

163. Indeed, one of the primary purposes in founding the U.S. Moo Duk Kwan Federation was to protect Hwang Kee's intellectual property rights. (Finding of Fact, *supra*, ¶ 54.)

164. If anything, Plaintiff appears to have been "overeager" in advancing its intellectual property. Phillip Duncan testified to mistakes made by "eager volunteers" who, in drafting Federation newsletters, used the mark ® to denote a registered trademarks even for marks that had not yet been registered. (Duncan Trial Test. at 121:16-122:5, 123:1-3, 163:14-164:24.)

165. Finally, Defendants introduced testimony about the World Moo Duk Kwan General Federation (WMDKGF) from Seoul, Korea, which, aside from incorporating "Moo Duk Kwan" in its name, uses the fist-and-laurel-leaves design, even though it is completely

separate from the Plaintiff Federation. (Eric Kovaleski Trial Test., Feb. 11, 2015, at 114:25-116:12.)

166. Plaintiff has not taken legal action against the WMDKGF. (*See* Duncan Trial Test. at 182:11-15.)

167. But the reason Plaintiff has not taken legal action against the WMDKGF is because that entity does not maintain a legal presence in the United States; it only maintains one in Korea. The Plaintiff therefore "couldn't find a way to take against them." (*Id.*)[12]

168. However, H.C. Hwang did meet with members of the WMDKGF in Korea in an (apparently unsuccessful) attempt to persuade them to change their corporate name. (*Id.* at 177:5-10.)

169. Moreover, Mr. Duncan testified that the Plaintiff was not subjectively concerned about the fact that WMDKGF members wore fist-and-laurel-leaves patches because these members are Moo Duk Kwan alumni who hold Dan positions issued by Hwang Kee. (*Id.* at 178:19-23.) Thus, "[f]or them to represent they are Moo Duk Kwan alumni is appropriate and not a problem for us." (*Id.* at 178:24-25.)

---

[12] The Court passes no judgment as to whether Plaintiff's expressed position is a legally valid one. For abandonment purposes, all that matters is that Plaintiff did not pursue litigation against WMDKGF because it subjectively believed that it could not.

### iii.  Fraud in the Trademark Application

170. Finally, Defendants assert a counterclaim for Fraud in Plaintiff's Trademark Application. (*See* Answ. to Am. Compl. at ¶¶ 83-88.)

171. H.C. Hwang and Phillip Duncan signed applications for the trademarks at issue, wherein each swore a variation of the following: "he believes [Plaintiff] to be the owner of the service mark sought to be registered; to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce either in the identical form or in such near resemblance thereof as to be likely, when used with the services of such other person, to cause confusion, or to cause mistake, or to deceive; and the facts set forth in this application are true; all statements made herein of his own knowledge are true and all statements made on information and belief are believed to be true." (*See* Trademark Applications, Pl.'s Exs. 82 at SBD-1497, 83 at SBD-1501, 84 at SBD-1505, 85 at SBD-1507.)

172. Defendants argue that "Plaintiff knew or should have known that this declaration was false, and that other practitioners of this Korean style of Karate had the permission to use these marks and designs directly from the Grandmasters in Korea to represent the martial art." (Answ. to Am. Compl. at ¶ 86.)

173. H.C. Hwang testified that, when he signed the above oath, he was unaware of any other person who had a better right to use the mark than the Plaintiff. (Hwang Trial

Test., Feb. 9, 2015, at 162:15-166:17; Hwang Trial Test., Feb. 10, 2015, at 6:24-8:20, 91:22-93:6.)

174. Philip Duncan testified the same. (Duncan Trial Test. at 150:19-153:25, 174:3-23.)

175. No independent evidence was presented at trial that could call H.C. Hwang or Philip Duncan's characterizations of their own mental states into question.

176. In a previous Opinion denying reconsideration of our denial of summary judgment, the Court stated that "[i]f Hwang [or, by extension, Duncan] knew at the time of the application that the marks sought to be registered were generic and/or descriptive terms that were as commonly used as Defendants claim, then [they] may indeed have acted fraudulently by claiming ownership, because marks in such common use could not be owned." (Mem. Op. Denying Reconsid., Nov. 4, 2014, Doc. 105, at 7.)

177. Thus, in the absence of explicit evidence showing that Hwang or Duncan knowingly signed a false statement, the fraud claim depends on a finding of whether the marks in question were generic and/or descriptive. The relevant findings of fact on this issue have already been stated in this Opinion, in Findings of Fact section (e)(i).

### f. Damages

178. No evidence was offered at trial showing that the Plaintiff sustained actual damages from Defendants' conduct.

179. Instead, Plaintiff's claim for damages is based on the facts that Defendants used and profited from the use of Plaintiff's trademarks. (*See, e.g.,* Pl.'s Proposed Findings of Fact, ¶¶ 79-83.)

180. Eric Kovaleski believes that removing the words "Moo Duk Kwan" from his school's name would hurt his business, because it would require him to incur expenses to change the school's certificates, logos, advertising, and the members' patches. (Eric Kovaleski Trial Test., Feb. 10, 2015, at 187:4-11.)

181. However, he does not believe that removing the words "Moo Duk Kwan" would make it more difficult to conduct the same business and get the same students. (*Id.* at 187:12-25, 201:2-16.)

182. He thinks that the symbol he uses represents Tang Soo Do to potential customers in a recognizable manner and that customers looking for Korean martial arts may be attracted to his business because of it. (*Id.* at 201:14-21.)

183. Robert Kovaleski also does not believe that "using the fist and laurel leaf design increases the profitability of [his] business," stating that "people come to my school or my son's school for us, not for any of the paperwork." (Robert Kovaleski Trial Test. at 61:15-62:1.)

184. "Defendants' organization had gross receipts of approximately $95,000 in 2009; $106,000 in 2010; $161,000 in 2011; $158,000 in 2012 and $122,000 in 2013." (Stipulated Facts, ¶ 18.)

185. Little evidence was admitted as to the source of Defendants' revenues. Defendants do, however, charge schools a one-time $500 fee to become a member of their organization. (Eric Kovaleski Trial Test., Feb. 11, 2015, at 27:3-11.) They also charge Dan members of their organization a $35 annual fee and charge Gup members a $25 lifetime membership fee. (*Id.* at 27:12-16.)

186. As discussed above, Defendants also sell merchandise and obtain revenue from events using the term "Moo Duk Kwan" and the fist-and-laurel-leaves emblem. (Findings of Fact, *supra*, ¶¶ 94-95, 98-100.)

187. Eric Kovaleski testified that, after deducting expenses from his gross revenues, he only makes a total of $15,000 to $20,000 per year. (Eric Kovaleski Trial Test., Feb. 11, 2015, at 182:3-4.) But Defendants provided no evidence beyond Mr. Kovaleski's testimony to substantiate these claims.

188. The context of these remarks is indicative of their lack of evidentiary weight:

ATTORNEY SCOTT SCHERMERHORN: Do you have to pay expenses out of [your stipulated revenues]?

ERIC KOVALESKI: Yes, I did.

MR. SCHERMERHORN: Do you make much in your business?

MR. KOVALESKI: 15 or $20,000 a year.

MR. SCHERMERHORN: After you're [*sic*] gross earnings that are reflected, you pay expenses, and you make, approximately, 15, 20,000 a year?

MR. KOVALESKI: Yes, sir.

(*Id.* at 182:1-7.)

189. These remarks—which are quoted in their entirety—are insufficient to demonstrate Defendants' net profits. The Court cannot accept something as true just because Eric Kovaleski said it; Defendants must offer some extrinsic reason to believe that the things they claim are actually true. Instead, Defendants have offered only an unsubstantiated, impromptu estimation of profits.

## III. Conclusions of Law

### a. Jurisdiction

1. "The district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

2. The Amended Complaint in this case alleges two counts under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, for Trademark Infringement (Am. Compl., Count I) and Trademark Counterfeiting (*id.*, Count II).

3. It also asserts a common law claim for Trademark Infringement and Unfair Competition. (*Id.*, Count III)

4. Defendants' counterclaims arise under the Lanham Act, 15 U.S.C. §§ 1064(3) (genericness, abandonment, and fraud) and 1052(e) (descriptiveness).

5. The Lanham Act is a federal law, enacted by the United States Congress, which provides in part that "[t]he district and territorial courts of the United States shall have original jurisdiction . . . of all actions arising under this chapter, without regard to the amount

41

in controversy or to diversity or lack of diversity of the citizenship of the parties." 15 U.S.C. §
1121(a).

6.   Moreover, Plaintiff's common law claim is before the Court under the doctrine
of pendent jurisdiction. "Pendent jurisdiction, in the sense of judicial power, exists whenever
there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties
made, or which shall be made, under their Authority,' U.S. Const., Art. III, s. 2, and the
relationship between that claim and the state claim permits the conclusion that the entire
action before the court comprises but one constitutional 'case.' The federal claim must have
substance sufficient to confer subject matter jurisdiction on the court. The state and federal
claims must derive from a common nucleus of operative fact. But if, considered without
regard to their federal or state character, a plaintiff's claims are such that he would ordinarily
be expected to try them all in one judicial proceeding, then, assuming substantiality of the
federal issues, there is power in federal courts to hear the whole." *United Mine Workers of
Am. v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed. 2d 218 (1966) (internal
citations omitted).

7.   Under these principles, the Court has original subject-matter jurisdiction over
this case, which arises under federal law, and has pendent jurisdiction over the Plaintiff's
common law claim.

42

### b. Trademark Infringement (Plaintiff's Count I)

8. The Lanham Act provides that "[a]ny person who shall, without the consent of the registrant-- (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114(1).

9. Plaintiff alleges both federal trademark infringement under 15 U.S.C. § 1114 and federal unfair competition under 15 U.S.C. § 1125(a)(1)(A) in Count I. The legal standards for these two alleged violations are identical. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

10. Because the analyses are identical, for ease of exposition, and because the Plaintiff only characterized Count I as a claim for "trademark infringement" at trial and in its post-trial submissions, the Court will only refer to Count I in this Opinion as alleging "trademark infringement."

11. To prove trademark infringement under 15 U.S.C. § 1114, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *Id.*

### i. Valid and Legally Protectable Mark; Ownership

12. "Any registration . . . of a mark registered on the principal register provided by [the Lanham Act] and owned by a party to an action . . . shall be *prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect . . . ." 15 U.S.C. § 1115(a).

13. As discussed above, Plaintiff registered the four trademarks at issue on the principal trademark register. (Findings of Fact, *supra*, ¶ 7, 61.)

14. Moreover, all of these trademarks have been in continuous use for five consecutive years subsequent to the date of their registration, and are still in use in commerce. (*See id.* at ¶ 64.)

15. In general, when a registered mark "has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce," then "the right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark" has been in use "shall be incontestable." 15 U.S.C. § 1065.

16. "To the extent that the right to use the registered mark has become incontestable under section 1065 . . . the registration *shall be conclusive evidence* of the

validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." *Id.* at § 1115(b) (emphasis added).

17. However, the right to use a mark does not automatically become incontestable after five years. It only becomes incontestable if, among other things, "an affidavit is filed with the Director within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and other matters specified" elsewhere in section 1065. *Id.* at § 1065(3).

18. The first three trademark registrations indicate that the requisite Lanham Act section 15 (15 U.S.C. § 1065) affidavits have been filed. (*See* Pl.'s Exs. 1-3; *cf. also* Pl.'s Ex. 4 (final trademark registration, showing no section 15 affidavit).

19. Thus, the Court finds that Plaintiff has proven that its first three marks have become incontestable under section 1065.[13]

20. The first two prongs of infringement under *A&H Sportswear* are therefore "conclusively" proven pursuant to section 1115(b). *Cf. also Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) ("The first two requirements, validity and

---

[13] As discussed below, the incontestable trademarks may still be subject to other forms of attack.

legal protectability, are proven where, as here, a mark was federally registered and has become 'incontestible' [sic] under the Lanham Act . . . .").

21. The fourth, contestable mark is inherently distinctive and therefore entitled to the lesser statutory protections accorded a distinctive registered mark in section 1115(a). See Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991) ("Where a mark has not . . . achieved incontestability, validity depends on proof secondary meaning, unless the incontestable mark is inherently distinctive.").

22. Defendants have presented no evidence to rebut Plaintiff's "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein" by registering this mark. See 15 U.S.C. § 1115(a).

23. The Court concludes that the facts that the fourth mark was registered and that no evidence has adequately rebutted the corresponding prima facie showing of validity, ownership, and exclusive right of use (with the possible exceptions of the counterclaims discussed below) mean that the fourth mark also satisfies the first two prongs of showing infringement under A&H Sportswear, 237 F.3d at 210.

### ii. Likelihood of Confusion

24. "A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Id.* at 211 (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992)).

25. "Proof of actual confusion is not necessary; likelihood is all that need be shown." *Ford Motor*, 930 F.2d at 292 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)).

26. "In determining whether there is a likelihood of confusion, [the Third Circuit has] adopted a non-exhaustive list of factors, commonly referred to within our Circuit as the '*Lapp* factors,' based on an early case in which they were set forth." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, ___ F.3d ___, 2015 WL 4366571, at *3 (3d Cir. 2015) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).

27. The *Lapp* factors, modified by subsequent case law, are as follows:

      (1) The degree of similarity between the owner's mark and the allegedly infringing mark;

      (2) The strength of the owner's mark;

      (3) The price of the goods and other factors indicating the care and attention one expects would be given when making a purchase;

(4) The length of time the alleged infringer has used the mark without

   evidence of actual confusion arising;

(5) The intent of the alleged infringer in adopting the mark;

(6) The evidence of actual confusion;

(7) Whether the goods are marketed through the same channels;

(8) The extent to which the target markets are the same;

(9) The perceived relationship of the goods, whether because of their near

   identity, similarity of function, or other factors; and

(10)  Other factors suggesting that the consuming public might expect the

   prior owner to manufacture both products, or expect the prior owner to

   manufacture a product in the defendant's market, or expect that the

   prior owner is likely to expand into the defendant's market.

*Id.* at *3; *A&H Sportswear*, 237 F.3d at 215.

28. "[T]he *Lapp* test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." *A&H Sportswear*, 247 F.3d at 215.

29. Nonetheless, "[t]he single most important factor in determining likelihood of confusion is mark similarity," i.e., *Lapp* factor (1). *Id.* at 216.

48

30. In the instant case, the Court concludes that *Lapp* factors (1), (7), (8), (9), and (10) strongly support a finding of likelihood of confusion.

31. As to factor (1), "[t]he test for such similarity is 'whether the labels create the same overall impression when viewed separately.' Marks 'are confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection, or sponsorship.' Side-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion. Instead, an effort must be made to move into the mind of the roving consumer." *Id.* (quoting *Fisons Horticulture*, 30 F.3d at 476).

32. Applying this standard, the marks do indeed create the same overall impression when viewed separately.

33. Both emblems contain nearly identical depictions of a fist surrounded by two laurel leaves, each of which contains six berries, and below which is a scroll containing Korean characters. Both emblems surround the fist-and-laurel-leaves design with the name of the respective organizations in a very similar fashion. (Finding of Fact, *supra*, ¶ 104.) While the emblems are not identical, they certainly "create the same overall impression when viewed separately" and a "roving consumer" not viewing them side-by-side would most likely conclude that they share a common source. The average martial-arts consumer would likely not be so sophisticated as to believe that the two emblems refer to different sources just because, for instance, the Korean writing on the scrolls is different, or because

49

different names surround the fist and laurel leaves, when the emblems are virtually identical in every other way.

34. The same can be said about the marks "United States Tang Soo Do Moo Duk Kwan Federation" and "Moo Duk Kwan." These marks are both confusingly similar to Defendant's name "International Tang Soo Do Moo Duk Kwan Association." The two marks use some different words, but the "dominant feature" of each, the trademarked term "Moo Duk Kwan," is the same. We know that Moo Duk Kwan is the dominant feature because the parties agree that all other words used in the parties' names are generic. (See Eric Kovaleski Trial Test., Feb. 11, 2015, at 6:2-7.) When "one feature of a mark may be more significant than other features . . . it is proper to give greater force and effect to that dominant feature." Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1065 (3d Cir. 1991) (quoting Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570 (Fed. Cir. 1983)). "When the dominant portions of the two marks are the same, confusion is likely." Id. Thus, the fact that the dominant portions of both Plaintiff's and Defendants' business names relies on Plaintiff's trademarked term "Moo Duk Kwan" supports a finding of a likelihood of confusion.

35. Lapp factors (7)-(10) also strongly support a finding of a likelihood of confusion. As discussed above, the parties' goods are marketed through the same channels and are directed toward the same target markets (i.e., toward consumers of martial arts services, in northeastern Pennsylvania and elsewhere). Moreover, the services being

offered—primarily, instruction in the art of Tang Soo Do Moo Duk Kwan—are identical

insofar as the Plaintiff's services stand in direct competition with those of the Defendants,

thus causing them to be closely related in the minds of consumers. Finally, the close

similarity between the marks and the services offered would likely cause the consuming

public to believe that the original owner of the mark, the Plaintiff, operated all services using

the mark. The public would likely believe this as there has been testimony that Hwang Kee

and his organization are well-known throughout the world and have been operating for a

longer period of time than the Defendants. (See, e.g., Seiberlich Trial Test. at 70:16-71:16;

Hwang Trial Test., Feb. 9, 2015, at 139:15-140:20.) The public may well be confused by a

smaller enterprise like the Defendants operating under marks commonly associated with the

more famous Plaintiff.

36. The parties have presented no evidence related to *Lapp* factor (2), and the

Court accordingly disregards it as irrelevant.

37. As to Lapp factor (3), the parties have presented some evidence indicating

the costs of the products and services that the Defendants provide. (Findings of Fact, *supra*,

¶¶ 94, 185.) The services are relatively inexpensive, such that, all else being equal,

potential martial-arts students would be unlikely to do extensive research on the background

of the schools before joining. Therefore, to the extent that *Lapp* factor (3) applies, it supports

a likelihood of confusion.

38. The Defendant has been using the marks for years, and yet no evidence was presented at trial that actual confusion has ever arisen. Thus, *Lapp* factors (4) and (6) tend to favor the Defendants.

39. Finally, *Lapp* factor (5), also weighs slightly in favor of Defendants. Eric Kovaleski was admittedly put on notice by the USPTO about a likelihood of confusion when the trademark examiner rejected his proposed trademarks on the grounds that they were likely to be confused with those of the Plaintiff and nonetheless continued to use the mark. (Eric Kovaleski Trial Test., Feb. 10, 2015, at 199:3-7; Eric Kovaleski Trial Test., Feb. 11, 2015, at 33:2-8.) However, his decision to do so is more likely attributable to a misunderstanding of trademark law than bad faith. The Court is unwilling to ascribe a culpable intent to Eric Kovaleski when his testimony demonstrates that he may have sincerely but erroneously believed that he was entitled to use these marks. (For further discussion of this point, see Conclusion of Law, *infra*, ¶¶ 139-42.)

40. On balance, the Court finds that the *Lapp* factors weigh heavily in favor of finding a likelihood of confusion. Those few factors that do not support this finding, i.e., (4) and (5), are offset by the fact that such proof of actual confusion is not necessary. (*See* Conclusions of Law, *supra*, ¶ 25.) Nearly all the others, including the most important one, "similarity of the marks," strongly support a finding that confusion is likely.

41. Therefore, the Court finds a likelihood of confusion.

42. Unless any of Defendants' counterclaims are successful, this means that the Court must enter judgment in favor of the Plaintiff for trademark infringement. The Court now turns to the counterclaims.[14]

### c. Defendants' Counterclaims

#### i. Genericness (Defendants' First Counterclaim)

43. A generic term is one "which function[s] as the common descriptive name of a product class." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986).

44. It "refers to the genus of which the particular product is the species." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S. Ct. 658, 661, 83 L. Ed. 2d 582 (1985); *see also Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 14 (1st Cir. 2008) ("Rather than answering the question 'where do you come from?,' a generic term merely explains 'what are you?' . . . . [Generic terms] serve primarily to describe products rather than identify their sources . . . .").

45. The Lanham Act "provides no protection for generic terms because a first-user of a term 'cannot deprive competing manufacturers of the product of the right to call an article by its name.'" *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) (quoting *A.J. Canfield*, 808 F.2d at 297).

---

[14] Though Plaintiff asserts additional claims in its Complaint for Trademark Counterfeiting and for Common Law Trademark Infringement (Counts II and III, respectively), these claims were never raised in its Trial Brief (Doc. 119), its post-trial Proposed Findings of Fact and Conclusions of Law (Doc. 137), the parties' Joint Pretrial Memorandum (Doc. 116), or at the trial itself. Therefore, the Court deems Count II abandoned in its entirety and deems Count III abandoned to the extent that the common law trademark infringement claim differs from the federal trademark infringement claim discussed *supra*.

46. Thus, the Act states that a registered mark that "becomes the generic name for the goods or services, or a portion thereof, for which it is registered" may be canceled "[a]t any time." 15 U.S.C. § 1064(3).

47. If a mark is generic, it does not matter whether the mark would be otherwise incontestable, as three of the Plaintiff's trademarks are. See 15 U.S.C. § 1065(4) ("[N]o incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered.").

48. "The same rule applies when the word designates the product in a language other than English. This extension rests on the assumption that there are (or someday will be) customers in the United States who speak that foreign language. Because of the diversity of the population of the United States, coupled with temporary visitors, all of whom are part of the United States marketplace, commerce in the United States utilizes innumerable foreign languages. No merchant may obtain the exclusive right over a trademark designation if that exclusivity would prevent competitors from designating a product as what it is in the foreign language their customers know best. Courts and the USPTO apply this policy, known as the doctrine of 'foreign equivalents,' to make generic foreign words ineligible for private ownership as trademarks." Otokoyama Co. v. Wine of Japan Import, Inc., 175 F.3d 266, 270-271 (2d Cir. 1999) (internal citation omitted).

49. "There is a presumption in favor of a registered trademark and the burden of proof is upon one who attacks the mark as generic, but the presumption can be overcome

by a showing by a preponderance of the evidence that the term was or has become

generic." *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.*, 684 F.2d 1316, 1319 (9th Cir.

1982); *cf. also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976)

(concluding that registration "means not only that the burden of going forward is upon the

contestant of the registration but that there is a strong presumption of validity so that the

party claiming invalidity has the burden of proof and must put something more into the

scales than the registrant.") (internal citations, alterations, and quotation marks omitted);

*interState Net Bank v. NetB@nk, Inc.*, 221 F. Supp. 2d 513, 517-518 (D.N.J. 2002) ("If a

party has a federal trademark registration, it constitutes a strong presumption that the term

is not generic or descriptive.").[15]

50. Defendants have put forward no evidence sufficient to discharge their burden

of proof and overcome by a preponderance of the evidence the *prima facie* validity of

Plaintiff's registered trademarks.

51. Defendants attempted to meet their burden by showing the use of

"Butokuden" in Japan in 794 A.D.; uses captured in karate magazines and Google image

searches; and the Kovaleskis' personal recollections of observing uses by practitioners

unaffiliated with the Plaintiff. (*See generally* Findings of Fact, *supra*, ¶¶ 120-153.)

---

[15] As these cases show, there is some disagreement as to the exact nature of Defendants' burden of proof on their genericness claim. The Court is aware of no controlling authority stating whether the Defendants need only prove their claim by *Anti-Monopoly*'s "preponderance of the evidence" or by some heightened standard, as in the other cases. However, the Court need not resolve these issues, because, even assuming that the most lenient preponderance of the evidence standard applies, Defendants' genericness claim still fails.

52. All of this evidence is, however, subject to the severe evidentiary defects discussed above. (*Id.*) By way of summary, there is no causal connection between the alleged Japanese use of Butokuden in 794 and the Korean use of Moo Duk Kwan in the early twentieth century. Nor is there any context to the magazines, Google searches, or the Kovaleski's personal recollections sufficient to cause this Court to conclude that the uses observed were not authorized by the Plaintiff, whether because they were made by present or former members of the Plaintiff organization or because they were made by people who bought the emblems at issue through an authorized dealer of Moo Duk Kwan merchandise.

53. But these past uses by themselves and without any additional context cannot logically imply that the term "Moo Duk Kwan" is the common descriptive term for the product class of Korean martial arts services or that the fist-and-laurel-leaves emblem reflects the genus of Korean martial arts services. If this could be implied, then all that would be necessary to establish genericness of any name or logo would be to show that it has been widely used by great numbers of people. By this logic, the fact that many people wear baseball hats with their favorite team's logo could be taken as evidence that the team logo is generic. Obviously, such reasoning is fallacious. Widespread use does not necessarily mean that a term or logo is generic; it may just as easily mean that the rightful trademark owner has achieved commercial success in distributing its products widely throughout the market. When, as here, the alleged uses do not contradict Plaintiff's claims of ownership—

and when, indeed, there is evidence that many of these uses were actually authorized by the Plaintiff, (see Findings of Fact, supra, ¶ 135)—genericness cannot be established.

54. Finally, even if these uses were in fact unauthorized by the Plaintiff, this need not show genericness. It may just as well show that other people have also infringed on Plaintiff's registered trademark rights. The fact that many other people infringed on Plaintiff's trademarks does not impact the Court's genericness inquiry.[16]

55. These conclusions should not be taken as contradicting the Court's previous statements that genericness could be established by showing at trial that "the terms and logos in this case . . . are in common use such that they may not be registered." (Mem. Op. Denying Reconsid. at 7-8 n.2.)

56. In ruling thusly, the Court made clear that, if the word "Moo Duk Kwan" were shown to be as common as a word like "pizza"—i.e., the generic name of the very item offered for sale by the parties—then the Court could determine that the term was generic. (See id.; see also Mem. Op. Denying Summ. J., Doc. 89, at 4-9.)

57. The Court made these statements in the contexts of denying summary judgment and then denying reconsideration of its summary judgment decision.

58. In so doing, it stated, in part: "it is unclear whether the many uses of the Moo Duk Kwan name and logo that Defendants compile in their exhibits in opposition to summary judgment, based on Google searches and reviews of old karate magazines, are

---

[16] It could, however, affect the Court's abandonment inquiry, infra.

actually evidence of generic and widespread use of the name and logo. They may in fact be, to the contrary, evidence of individual uses that were approved by the Plaintiff federation or even examples of Plaintiff's own use of its own marks. Without any context behind the various uses of the trademarks, the Court cannot know what kind of use is being displayed. This factual dispute will have to be resolved at trial, when the authenticity, context, and meaning of Defendants' exhibits can be better established." (Mem. Op. Denying Summ. J. at 9.)

59. Now that the trial has occurred, the Court may assess the weight of Defendants' exhibits in a way that it could not on summary judgment.

60. For all the reasons discussed above, the trial did not add any context to Defendants' exhibits to establish genericness even by a preponderance of the evidence.

61. Therefore, the Court will enter judgment in favor of the Plaintiff on Defendants' genericness counterclaim.

*ii. Mere Descriptiveness (Defendants' Second Counterclaim)*

62. The Lanham Act differentiates "a mark that is 'the common descriptive name of an article or substance' from a mark that is 'merely descriptive.'" *Park 'N Fly*, 469 U.S. at 193-94.

63. The former "are referred to as generic" and are subject to the Conclusions of Law stated in the immediately preceding section. *See id.* at 194.

64. "A 'merely descriptive' mark, in contrast, describes the qualities or characteristics of a good or service, and this type of mark may be registered only if the registrant shows that it has acquired secondary meaning, i.e., it 'has become distinctive of the applicant's goods in commerce.'" *Id.* (quoting 15 U.S.C. § 1052(e), (f)).

65. The Lanham Act requires that a petition to cancel a mark may only be filed "[w]ithin five years from the date of the registration of the mark under this chapter." 15 U.S.C. § 1064(1).

66. "Section 1064 is 'in effect, a five year time limit barring certain attacks on a registration.'" *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579 n.5 (Fed. Cir. 1990) (quoting *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 761 n.6 (C.C.P.A. 1982)).

67. This provision does, however, include several exceptions, which apply to Defendants' other three counterclaims. *See* 15 U.S.C. § 1064(3).

68. Cancellations based on descriptiveness are not among those allowed to be cancelled more than five years after registration. *See generally id.* at § 1064.

69. Even if this were not true, the Defendants' descriptiveness counterclaim would depend on all the same evidence discussed under the "genericness" section, above.

70. Insofar as the evidence does not suggest that the term "Moo Duk Kwan" or the fist-and-laurel-leaves emblem represent the genus of which the parties' services are the

species, it also does not suggest that these marks "describe the qualities or characteristics" of the parties' services.

71. Nor is it even conceptually clear how these marks could in fact "describe qualities or characteristics" of a type of martial art if they are not also generic for the type of martial art services rendered. No clarification was provided at trial.

72. Therefore, the Court will enter judgment in favor of the Plaintiff on Defendant's descriptiveness counterclaim.

### iii. Abandonment (Defendants' Third Counterclaim)

73. "A mark shall be deemed to be 'abandoned' if . . . the following occurs: . . . When any course of conduct of the owner including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark." 15 U.S.C. § 1127(2).

74. A mark that "has been abandoned" may be cancelled "[a]t any time." *Id.* at § 1064(3).

75. As with the genericness counterclaim, even an incontestable mark can be cancelled if it "has been abandoned by the registrant." *Id.* at 1115(b)(2).

76. "[A]bandonment, being in the nature of a forfeiture, must be strictly proved." *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981); *see also Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) ("[A] party arguing for abandonment has a high burden of proof.").

77. Defendants argue that Plaintiff's trademarks were abandoned because "Plaintiff's own course of conduct has caused the marks to become generic due to a lack of enforcement of the marks. Specifically, the evidence is overwhelming that the marks are used widely throughout trade magazines, events, on products, etc., for decades without any action by the Plaintiff to enforce the same, except for 4 occasions, the Defendants herein being one of them." (Defs.' Proposed Conclusions of Law, Doc. 138, at ¶ B(2).)

78. As repeatedly discussed above, there is no evidence sufficient to carry Defendants' burden of proof on their genericness claim. Therefore, the Court cannot conclude that the uses cited by the Defendants have "cause[d] the mark to become the generic name for the goods or services on or in connection with which it is used" under section 1127.

79. Defendants would therefore need to show that some other course of conduct has "caused [the trademarks] to lose [their] significance as . . . mark[s]." 15 U.S.C. § 1127(2).

80. The only evidence of such a course of conduct produced at trial was evidence that Plaintiff somehow failed to police infringements of its own marks. (Findings of Fact, *supra*, ¶¶ 155-56.)

81. This evidence is subject to the defects discussed in the Findings of Fact above. (*Id.* at ¶¶ 120-153, 157)

82. As discussed in those Findings of Fact, it is not at all clear that Defendants' evidence actually shows a failure to enforce Plaintiff's trademarks; there is evidence that many of the uses shown were either authorized by the Plaintiff, prosecuted by the Plaintiff, or are uses as to which no party has knowledge of the status of the mark. (*See id.* at ¶¶ 158-69.)

83. Moreover, there has been testimony that the Plaintiff devotes a great deal of resources to enforcement activities. (*See id.* at ¶¶ 159-61.)

84. But even if many of these uses were infringing uses that the Plaintiff did not police, that does not establish that any such non-enforcement has caused the Plaintiff's marks to lose their significance as a mark. *Cf. Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1047-48 (4th Cir. 1984) ("In the typical trademark litigation, the relevance of failure to prosecute others is not to 'abandonment,' but to 'strength.' The issue is hardly ever 'abandonment,' because that requires proof that the mark has lost all significance as an indication of origin.") (quoting J. McCarthy, *Trademarks and Unfair Competition*, § 17:5 at 779-780 (2d ed. 1984)).

85. In other words, whether Plaintiff properly polices its own marks has no bearing on the "significance" of its trademarks. There has been testimony that the marks retain significance as being related to Hwang Kee's school. In the absence of a viable genericness claim, all that any purported lack of enforcement could mean is that many people violate Plaintiff's trademarks. This does not, by itself, indicate a weakening of the tie

between the marks and the Plaintiff organization. A "trademark owner is not required to take action against every infringing or *de minimis* use of its mark." *Hershey Co. v. Promotion in Motion, Inc.,* Civ. No. 07-1601, 2011 WL 5508481, at *7 (D.N.J. 2011).

86. Therefore, the Court will enter judgment in favor of the Plaintiff on Defendants' abandonment counterclaim.

> iv. *Fraud in the Trademark Application (Defendants' Fourth Counterclaim)*

87. A "registration [that] was obtained fraudulently" may also be cancelled "[a]t any time." 15 U.S.C. § 1064(3).

88. As with the genericness and abandonment counterclaims, even an incontestable mark may be cancelled if the Defendants can show "[t]hat the registration or the incontestable right to use the mark was obtained fraudulently." *Id.* at § 1115(b)(1).

89. "Fraud in procuring a service mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *Metro Traffic Control, Inc. v. Shadow Network, Inc.,* 104 F.3d 336, 340 (Fed. Cir. 1997).

90. "The obligation which the Lanham Act imposes on an applicant is that he will not make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration forming a part of the application for registration." *Id.*

91. Thus, fraud "requires a purpose or intent to deceive the PTO in the application for the mark." *Sovereign Military Hospitaller Order of St. John of Jersulam, of*

*Rhodes, and of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of St. John of Jerusalem*, 702 F.3d 1279, 1289 (11th Cir. 2012).

92. "If the declarant subjectively believes the applicant has a superior right to use the mark, there is no fraud, even if the declarant was mistaken." *Id.* at 1292.

93. "A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. Indeed, the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (internal citations and quotation marks omitted).

94. As discussed above, no direct evidence of the declarants' mental state was presented at trial to show that they made knowingly false statements. Indeed, all evidence of mental state indicates that the declarants believed their statements to be true. (Findings of Fact, *supra*, ¶¶ 173-74.)

95. Nor was any evidence produced at trial to show that the statements were *in fact* false. The preponderance of the evidence shows that Plaintiff had the superior right to use the marks, insofar as Defendants' evidence of other uses is unconvincing, for reasons already demonstrated.

96. If evidence had been presented at trial sufficient to prove that the marks sought to be registered were generic, then the Court could possibly infer from the

64

circumstances that the declarants knew that they could not register the marks but made false statements to the contrary anyway. *Bose*, 580 F.3d at 1244 (agreeing with the proposition that "intent must often be inferred from the circumstances").

97. Even if the genericness counterclaim had been proven, this would not necessarily prove the fraud counterclaim, because the former may be proven by a preponderance of the evidence, whereas the latter is subject to the heightened clear-and-convincing-evidence standard. Nonetheless, a finding of genericness would make a finding of fraud possible.

98. No evidence was presented to prove that the trademarks were generic by a preponderance of the evidence.

99. There is accordingly no evidence from which the Court could infer that the declarants knew their statements were false.

100. Therefore, the Court will enter judgment in favor of the Plaintiff on Defendants' fraud counterclaim.

### v. Conclusion

101. The Court has now rejected all four of Defendants' counterclaims. This means that the Court must enter judgment in favor of the Plaintiff on its claim of trademark infringement.

### d.  Liability

#### i.  Liability of the Various Defendants

102. The acts of infringement enumerated above were committed by Defendant Tang Soo Karate School, Inc. Therefore, the corporation Tang Soo Karate School, Inc. is liable for trademark infringement.

103. As to the Defendant Kovaleskis, the Lanham Act imposes liability on "[a]ny person" who commits the types of trademark infringement discussed in this Opinion. See 15 U.S.C. §§ 1114(1), 1125(a)(1).

104. These sections of the Lanham Act are "very broadly worded and appl[y] to 'any person' who uses virtually any means to deceive the public regarding the origin or nature of goods, services, or commercial activities." Elec. Lab. Supply Co. v. Cullen, 977 F.2d 798, 807 (3d Cir. 1992).

105. "It is well settled that one who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing activity of another, may be held liable as a 'contributory' infringer. An officer or director of a corporation who knowingly participates in the infringement can be held personally liable, jointly and severally, with the corporate defendant." Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 160 (3d Cir. 1984) (internal citations and quotation marks omitted); see also Metromedia Steakhouses Co. v. Resco Mgmt., Inc., 168 B.R. 483, 486 (D.N.H. 1994) (relying on the "any person" language to conclude that "[p]ursuant to the plain language of the Lanham Act,

*any individual* may be liable in civil action for damages"); *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1043 (D.N.J. 1990) ("Corporate officers and principal shareholders can be personally liable for infringement and unfair competition claims."); *Ford Motor Co. v. B&H Supply, Inc.*, 646 F. Supp. 975, 997 (D. Minn. 1986) ("In addition to the liability of the various corporate defendants, the court concludes that the individual officers and principal shareholders are personally liable for damages suffered by Ford. . . . These individual defendants [who owned, controlled, and actively participated in the business of their respective corporations] may thus be held personally liable for the claims of trademark infringement and unfair competition.").

106. The parties agree that both Eric and Robert Kovaleski materially contributed to the trademark infringements at issue in this case. (*See* Stipulated Facts, ¶ 5 ("Defendant Robert Kovaleski is the past President of Defendant TSKSI and has been directly involved in and has directed such association in adopting and using the marks INTERNATIONAL TANG SOO DO MOO DUK KWAN ASSOCIATION and a fist and laurel leaves Design which are accused of infringement in this case.); *id.*, ¶ 6 ("Defendant Eric Kovaleski is the current President of Defendant TSKSI and has been a moving force and directly involved in the use of the marks INTERNATIONAL TANG SOO DO MOO DUK KWAN ASSOCIATION and the fist and laurel leaves Design by such organization.")).

107. "[F]actual stipulations are 'formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.

67

Thus, a judicial admission is conclusive in the case.'" *Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 677-78, 130 S. Ct. 2971, 2983, 177 L. Ed. 2d 838 (2010) (quoting 2 K. Broun, McCormick on Evidence § 254, p. 181 (6th ed. 2006)) (internal alterations omitted).

108. This is so even if the stipulation is contradicted by testimony at trial. If trial testimony contradicts the stipulation, then it is the stipulation that must be accepted as true. *See Leizerowski v. E. Freightways, Inc.*, 514 F.2d 487, 490 (3d Cir. 1975) ("Because this testimony was in direct conflict with a conclusively established fact by stipulation, it could not be relied on by the court as evidence . . . .").

109. "Litigants, we have long recognized, 'are entitled to have their case tried upon the assumption that facts, stipulated into the record, were established.'" *Christian Legal Soc'y*, 561 U.S. at 676 (quoting *H. Hackfield & Co. v. United States*, 197 U.S. 442, 447, 25 S. Ct. 456, 49 L. Ed. 826 (1905)) (internal alterations omitted).

110. Therefore, the Defendant Kovaleskis' personal involvement in the trademark infringements has been established by stipulation. Both of them will accordingly be held personally liable for infringement.

### ii. Injunctive Relief

111. "The several courts vested with jurisdiction of civil actions arising under [the Lanham Act] shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of

the registrant of a mark registered in the Patent and Trademark Office or to prevent a

violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a).

112. "According to well-established principles of equity, a plaintiff seeking a

permanent injunction must satisfy a four-factor test before a court may grant such relief. A

plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies

available at law, such as monetary damages, are inadequate to compensate for that injury;

(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct.

1837, 1840, 164 L. Ed. 2d 641 (2006).

113. "Grounds for irreparable injury include loss of control of reputation, loss of

trade, and loss of goodwill. Lack of control over one's mark creates the potential for damage

to reputation . . . . Thus, trademark infringement amounts to irreparable injury as a matter of

law." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) (internal citations,

quotation marks, and alterations omitted).

114. Trademark infringement need not automatically result in a finding of

irreparable injury when the infringement claim relies on an assertion of actual damages. *See*

*Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 237 (3d Cir. 2003).

115. But the situation is different, when, as here, the infringement claim asserts a

likelihood of confusion. *Cf. id.* "Once the likelihood of confusion caused by trademark has

been established, the inescapable conclusion is that there was also irreparable injury." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)) (internal alterations omitted).

116. Because the Plaintiff has established all elements of trademark infringement, including a likelihood of confusion, the Court finds that the "irreparable injury" prong is satisfied.

117. Proceeding to the second prong, "loss of control of reputation, loss of trade, and loss of good will" are harms "of a peculiar nature, so that compensation in money cannot atone for" them. *See Opticians*, 920 F.2d at 195 (3d Cir. 1990) (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)).

118. Defendants' use of Plaintiff's trademarks at the very least caused Plaintiff to lose control over its reputation. Defendant Tang Soo Karate School is a separate entity from the Plaintiff with a reputation of its own, which the Plaintiff cannot control.

119. In so concluding, the Court need not determine which entity has a better reputation or has put the marks to better use. "[T]he key in these cases is not better use, but rather, lack of control which potentially might result in a damaged reputation." *Id.*

120. An injunction would also protect the Plaintiff against *future* infringement, which money damages cannot do.

121. Therefore, money damages are inadequate to remedy Defendants' trademark infringement. Most district courts dealing with these issues in the context of a

permanent injunction restraining trademark infringement have concluded the same. *See,*
*e.g., Rovio Entm't, Ltd. v. Allstar Vending, Inc.,* ___ F. Supp. 3d ___, 2015 WL 1508497, at
*7 (S.D.N.Y. 2015) ("Toy Amazon's past behavior suggests that Toy Amazon might continue
to engage in infringing activities and counterfeiting unless enjoined by the Court,
demonstrating the danger that monetary damages will fail to fully provide Rovio with relief.");
*E.A. Sween Co. v. Deli Express of Tenafly, LLC,* 19 F. Supp. 3d 560, 577 (D.N.J. 2014)
("Defendant's continued infringing activity threatens E.A. Sween's reputation and goodwill.
The remedy of injunctive relief will protect E.A. Sween against the threat of future
infringement, a threat that cannot be averted by compensatory relief alone."); *7-Eleven, Inc.*
*v. Upadhyaya,* 926 F. Supp. 2d 614, 630 (E.D. Pa. 2013) ("The Court finds that 7–Eleven
has shown irreparable injury resulting from loss of control of its marks, which cannot be
compensated for in monetary terms."); *S&H Indus., Inc. v. Selander,* 932 F. Supp. 2d 754,
765 (N.D. Tex. 2013) ("Plaintiff's loss of control also demonstrates that money damages
cannot adequately compensate Plaintiff for Defendant's unauthorized use of the Mark.");
*Coryn Group II, LLC v. O.C. Seacrets, Inc.,* 868 F. Supp. 2d 468, 497 (D. Md. 2012)
("Monetary damages often do not accurately measure or compensate for damage to a
senior user's reputation and goodwill. The likelihood of continued infringement renders
monetary damages inadequate.") (internal citations omitted).

122. Next, the balance of harms weighs in favor of the granting a permanent
injunction.

123. Defendants have testified that the costs they would face from ceasing use of the marks are minimal and primarily consist of putting up new signs. (Findings of Fact, *supra*, ¶¶ 180, 183.) Their primary objection at trial was not that it would be costly to remove the infringing uses, but simply that they should not, in justice, have to remove them. (*See* Eric Kovaleski Trial Test., Feb. 11, 2015, at 181:3-19.)

124. Plaintiff, on the other hand, stands to suffer the serious and intangible losses of control over its reputation and goodwill discussed above.

125. Moreover, because Defendants have no legal basis to continue the infringing uses, then an injunction only prevents them from persisting in unlawful conduct. *Cf. Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J. 1998) (holding that an infringing party cannot complain about injury "if a preliminary injunction is issued because he misappropriated the Mark and Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff").

126. Finally, the public interest favors an injunction.

127. "In a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.' Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) (citing *Opticians*, 920 F.2d at 197-98).

128. Therefore, the public interest favors eliminating the likelihood of confusion caused by Defendants' infringement, which is the purpose intended to be served by the Lanham Act. *See, e.g.*, *Kos*, 369 F.3d at 730.

129. For all of these reasons, the Court will issue an injunction restraining Defendants Tang Soo Karate School, Inc., Eric Kovaleski, Robert Kovaleski, and all persons in active concert with them from infringing the trademarks at issue in this case.

### iii.  Monetary Damages

130. "When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction." 15 U.S.C. § 1117(a).

131. The Plaintiff has provided no evidence of damages. It relies instead on a recovery of Defendants' profits. (*See* Pl.'s Proposed Conclusions of Law, Doc. 137, at 75-79.)

132. "An accounting for profits is a form of equitable relief, and it does not follow as a matter of course upon the mere showing of an infringement. It will be denied where an

73

injunction satisfies the equities of a case, as for example, where there is a clear showing

that no profit was made." *Williamson-Dickie Mfg. Co. v. Davis Mfg. Co.*, 251 F.2d 924, 927

(3d Cir. 1958); *see also Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1337

(D.N.J. 1994) ("[U]nder the express language of § 1117, an accounting of profits is not

automatic and is granted in light of equitable considerations. The Third Circuit repeatedly

has held that an accounting will be denied where an injunction forbidding future infringing

acts satisfies the equities of the case.") (collecting cases).

133. Courts apply a factor-based approach to determine "whether an award of

profits is appropriate in trademark infringement cases. The factors to be considered include,

but are not limited to '(1) whether the defendant had the intent to confuse or deceive, (2)

whether sales have been diverted, (3) the adequacy of other remedies, (4) any

unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making

the misconduct unprofitable, and (6) whether it is a case of palming off.'" *Quick Techs., Inc.*

*v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002) (quoting *Pebble Beach Co. v. Tour*

*18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998), *abrogated on other grounds*), *followed by Banjo*

*Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005), *Gucci*, 354 F.3d at 241.

134. Several of these factors are easily disposed of.

135. For instance, there has been no evidence that actual sales have been

diverted. The Plaintiff's theory for recovery has always been that a likelihood of confusion

exists. (*See, e.g.*, Pl.'s Proposed Findings of Fact, ¶¶ 79-83.)

136. Nor is this a case of "palming off." "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1, 123 S. Ct. 2041, 2045, 156 L. Ed. 2d 18 (2003). Here, the Defendants did not misrepresent that its services were being provided by the Plaintiff Federation; they used their own trade name to designate their own services, but simply did so in a way that violated the Plaintiff's trademark rights. This case, therefore, is a traditional matter of trademark infringement and not palming off.

137. Accordingly, factors (2) and (6) clearly weigh against granting profits.

138. Factor (4), "any unreasonable delay by the plaintiff in asserting [its] rights" has no relevance to the case. Plaintiff has not acted unreasonably in asserting its rights. But the fact that Plaintiff was not an unreasonable litigant does not advance Plaintiff's entitlement to profits.

139. As to "an intent to confuse or deceive" (factor (1)), carelessness need not equate to a culpable intent to confuse or deceive. *Cf. SecuraComm Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182, 189 (3d Cir. 1999) ("[C]arelessness is not the same as deliberate indifference with respect to another's rights in a mark or a calculated attempt to benefit from another's goodwill. Therefore, Securacom New Jersey's failure to conduct a trademark search is insufficient to establish that its infringement was willful or intentional.") (internal citation omitted), *superseded by statute on other grounds*, 15 U.S.C. § 1117(a).

140. Here, the evidence shows that Eric Kovaleski was most likely simply careless and/or ignorant of trademark law. The Court does not question the sincerity of his belief that the marks in question were generic. Without knowing the background of all the marks contained in certain karate magazines, a layperson unversed in trademark concepts might well conclude that widespread use indicates genericness, even if this lay belief has no legal validity. Thus, the fact that he used the marks does not necessarily mean that he acted with an intent to confuse or deceive. He may well have believed that he was authorized to use them.

141. This conclusion is weakened by the fact that Mr. Kovaleski was twice put on notice by the USPTO that the marks he sought to trademark would cause a likelihood of confusion with Plaintiff's marks. That is because (1) the fact that he believed that he could trademark his own mark may show that he did not honestly believe that the marks were generic and (2) having been notified of a likelihood of confusion by the USPTO, it is difficult to understand how he could believe that his uses did not infringe on Plaintiff's marks.

142. Nonetheless, the Court concludes that Mr. Kovaleski's actions are still motivated by legal ignorance and not by any culpable intent to confuse or deceive. Mr. Kovaleski's testimony indicated that he believed that as long as there is any difference at all, no matter how insignificant, between the logos and names used by a trademark owner and a non-owner, then the non-owner's use is authorized. (See Eric Kovaleski Trial Test., Feb. 11, 2015, at 5:6-9.) Being intimately involved in the martials-arts world for a long period of

time, Mr. Kovaleski may himself not be confused by the differences between the Plaintiff's and Defendants' marks. The evidence indicates that these motivating belief, though misguided, were ultimately sincere. As such, the Court cannot infer an intent to confuse or deceive.

143. Therefore, factor (1) weighs slightly against disgorging profits.

144. Notwithstanding all of the foregoing, when the Court considers "the adequacy of other remedies" (factor 3) and "the public interest in making the misconduct unprofitable" (factor 5), it becomes clear that some disgorgement of profits is warranted.

145. The public interest that the Lanham Act was created to promote is to eliminate consumer confusion as to the source of goods and services. (Conclusion of Law, *supra*, ¶ 127.) The Court has already concluded that Defendants Eric Kovaleski and Tang Soo Karate School, Inc. infringed Plaintiff's trademark rights by using marks that cause a strong likelihood of confusion. Therefore, this case presents exactly the type of conduct that the Lanham Act was drafted to prevent.

146. Given that this is so, the Court cannot conclude that ordering injunctive relief only—which would merely restrain Defendants from violating Plaintiff's rights in the future— adequately remedies the harm to the Plaintiff caused by the likelihood of confusion or deters these types of trademark violations by making them unprofitable. This case was filed over three years ago, and has been fiercely litigated at all stages, beginning with a motion for a preliminary injunction, continuing through a motion summary judgment and reconsideration

of the Court's summary judgment Opinion, and ending with a bench trial that extended for four days. Without knowing the extent of the parties' legal expenses, it is reasonable to assume that retaining skilled counsel for such a case has placed at least some financial burden on the Plaintiff that it would otherwise prefer not to bear. Moreover, when Plaintiff filed this case in 2012, it had to have believed that the benefits of filing the case could ultimately outweigh the costs. If Plaintiff—or any other trademark holder—believed that litigating violations of its trademark rights in federal court would not lead to any appreciable benefit, but would instead only cause it to incur unwanted legal expenses, then cases such as this would likely never be filed.

147. Awarding only injunctive relief would therefore send the message that litigating trademark violations is not an investment that pays off; it would mean that Defendants would be able to use marks that they do not own for years with no consequence other than a restraint on their ability to continue such unlawful conduct in the future. It would also disincentivize trademark owners from litigating violations of their rights on the grounds that any victory, however many years in the future, would only apply to prospective conduct.

148. The equities in this case therefore require that Plaintiff receive monetary recovery for the violations of its rights and that Defendants not be permitted years of rights-violations with no consequences but prospective restraint. The public interest promoted by the Lanham Act compels the conclusion that injunctive relief is by itself inadequate in the case before us.

149. Therefore, factors (3) and (5) require this Court to assess an award of profits against the Defendants in favor of the Plaintiff.

150. "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

151. The parties have stipulated that "Defendants' organization had gross receipts of approximately $95,000 in 2009; $106,000 in 2010; $161,000 in 2011; $158,000 in 2012 and $122,000 in 2013." (Finding of Fact, *supra*, ¶ 184.)

152. This satisfied the Plaintiff's burden of proving sales.

153. As discussed above, Defendant has offered no reliable evidence to prove costs or deductions from those sales. The total profits claimed ($15,000 to $20,000) are supported only by Eric Kovaleski's unsubstantiated trial testimony. (*Id.* at ¶¶ 187-189.)

154. This means that Plaintiff has proven a total $642,000 in sales over the time period in question and that Defendants have not proven any costs or deductions.

155. However, the Lanham Act also provides that, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

156. The Court finds that ordering disgorgement of the full $642,000 is clearly excessive, given the circumstances of this case. This is so for several reasons.

157. First, as discussed above, the infringement was likely not done with any culpable mental state, but merely out of an ignorance of trademark law and of what makes a mark generic.

158. Second, the Court recognizes that "[t]he infringement having been proved, and the competitive sales of defendants' goods bearing the infringing mark having been shown, the burden is then upon defendants to demonstrate, if they can, that profits were not derived from the infringing use. 'The burden is the infringer's to prove that his infringement had no cash value in sales made by him.'" *Williamson-Dickie*, 251 F.2d at 927 (quoting *Mishawaka Rubber & Woolen Mfg. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07, 62 S. Ct. 1022, 1024, 86 L. Ed. 1381 (1942)). Nonetheless, Defendants have testified that students come to their karate studio "for us," and not based on the marks that they use. (Finding of Fact, *supra*, ¶ 183.) The Court sees no reason to disbelieve this testimony. Northeastern Pennsylvania has a finite number of karate studios. It is reasonable to believe that most consumers choose the studios based on factors such as general reputation and proximity to home instead of which trademarks the studios use. Given these facts, and despite the fact that the evidence shows that Defendants gained some income directly from their use of the marks, (*id.* at ¶¶ 94-95, 98-100 185), it would be unreasonable to assume that their profit was so extensive that it justifies full disgorgement of five years of gross revenues.

159. Finally, the Court recognizes that the Defendants have modest means. They operate a karate studio in a "small area" in northeastern Pennsylvania. (Robert Kovaleski

Trial Test. at 61:3-12.) Given the yearly revenues in the parties' Stipulated Facts and accepting that some amount of money must be deducted for expenses (even though the exact amount is unproven), Defendants do not make a large yearly income. Entering judgment for $642,000 would therefore be an undue burden. While the personal characteristics of the Defendants would not necessarily be enough by themselves to offset the judgment in every case, when considered in conjunction with the other findings listed above, the Court believes it weighs in favor of offset in this particular case.

160. For all of these reasons, the Court exercises its discretion to adjust the disgorgement of profits downward from the excessive $642,000 proven at trial.

161. The Court concludes that the equitable approach is to estimate a reasonable rate of profit from Defendants' total revenues and order a commensurate amount of profits to be disgorged.

162. Disgorgement of 18% of total revenues is considered equitable under the circumstances.

163. This leads to a total disgorgement of $115,560, which averages to $23,112 for each of the five years at issue.

164. Assessing this level of disgorgement balances the Plaintiff's equitable interest in receiving an adequate recovery for the violation of its trademark rights with Defendants' equitable interest in only paying an amount of damages proportionate to the nature of its conduct.

81

### iv.  Attorneys' Fees and Costs

165. "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).

166. The Supreme Court recently ruled on the meaning of identical language found in section 285 of the Patent Act. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, ___ U.S. ___, 134 S. Ct. 1749, 1755-56, 188 L. Ed. 2d 816 (2014).

167. It construed the term "exceptional . . . in accordance with its ordinary meaning" at the time of the Patent Act's passage as "uncommon, rare, or not ordinary." *Id.* at 1756 (quoting Webster's New International Dictionary 889 (2d ed. 1934)).

168. The Supreme Court then concluded that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.*

169. "While *Octane Fitness* directly concerns the scope of a district court's discretion to award fees for 'exceptional' cases under § 285 of the Patent Act, the case controls our interpretation of § [1117(a)] of the Lanham Act. Not only is § 285 identical to § [1117(a)], but Congress referenced § 285 in passing § [1117(a)]." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314-15 (3d Cir. 2014).

170. "Under *Octane Fitness*, a district court may find a case 'exceptional,' and therefore award fees to the prevailing party, when (a) there is an unusual discrepancy in the

merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'" *Id.* at 315 (quoting *Octane Fitness*, 134 S. Ct. at 1756).

171. "Whether litigation positions or litigation tactics are 'exceptional' enough to merit attorneys' fees must be determined by district courts 'in the case-by-case exercise of their discretion, considering the totality of the circumstances.' Importantly, that discretion is not cabined by a threshold requirement that the losing party acted culpably." *Id.* (quoting *Octane Fitness*, 134 S. Ct. at 1756).

172. The Court cannot conclude that the instant case is an "exceptional" case warranting attorneys' fees.

173. There is no "unusual discrepancy in the merits of the positions taken by the parties." Even though the Court ultimately concluded that Plaintiff's positions were entirely sound and Defendants' positions were entirely unsound, there was at least a colorable basis in law for each of Defendants' counterclaims. The Court does not see fit to penalize Defendants for trying to make the strongest arguments they could with the facts and law available to them, even if their arguments were ultimately unsuccessful.

174. There is also no basis to conclude that Defendants "litigated the case in an unreasonable manner," nor has anyone proffered such a basis.

175. Finally, the Court may award "subject to the principles of equity . . . the costs of the action." 15 U.S.C. § 1117(a).

176. For the same reasons discussed above, the Court does not find it appropriate to assess costs. The Court believes that disgorgement of profits equitably compensates Plaintiff for its burdens in litigating this case. Given the equitable positions of the parties, as discussed *passim*, the Court does not believe that further recovery is appropriate.

## IV.    Conclusion

For the foregoing reasons, the Court will enter judgment in favor of the Plaintiff, United States Soo Bahk Do Moo Duk Kwan Federation, Inc., and against Defendants Tang Soo Karate School, Inc., Eric Kovaleski, and Robert Kovaleski in the form of (1) a permanent injunction restraining any further infringements of Plaintiff's trademarks (2) and money damages in a total amount of $115,560. The Court will enter judgment in favor of the Plaintiff and against the Defendants on each of the Defendants' counterclaims. A separate Order of Judgment follows.

DATE: 8/17/15

Robert D. Mariani
United States District Judge